**CREWS v. UNITED STATES.**

No. 11796.

Circuit Court of Appeals, Fifth Circuit.
April 5, 1947.

Rehearing Denied May 1, 1947.

Charles Cook Howell, of Jacksonville, Fla., for appellant.

Herbert S. Phillips, U. S. Atty., of Tampa, Fla., Fred G. Folsom, Atty., Dept. of Justice, of Washington, D. C., and Fred S. Rogers, Asst. Atty. Gen., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The beautiful Suwannee River—the mention of which calls to memory a plaintive melody of strumming banjos, humming bees, childhood's playful hours, a hut among the bushes, and a longing to go back to the place where the old folks stay—was the scene of the cruel and revolting crime that provoked the gesture of dealing out justice that is this case.

The defendant, although guilty of a cruel and inexcusable homicide, was indicted and convicted merely of having deprived his helpless, victim of a constitutional right, under strained constructions [1] of an inadequate Federal statute,[2] and given the maximum sentence under that statute of one year in prison and a fine of $1,000.

Sam McFadden—"Puddin" he was customarily called—was missing for some time from the little village of Branford on the banks of the Suwannee River in the county that bears the river's name. Some knew that he had gone away but none knew where until his bleached and putrescent corpse was discovered by fishermen against the overhanging willows at the edge of a little island in the middle of the river.

It would have been better for the county's reputation for law and order among justice-loving men had this piece of decaying flotsam drifted out into the sea and into oblivion and the facts of its venomous and vicious slaying had never come to light. But the willows arranged otherwise and held it until the fishermen came.

Tom A. Crews, the defendant, was the Town Marshal of Branford and also the Constable of the District that embraced the Town. He was "the law," twice fortified.

---

[1] United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Screws v. United States, 5 Cir., 140 F.2d 662; Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330.

[2] § 52, Title 18 U.S.C.A.

Four or five months before the occasion involved in the present case, the Constable was said to have had trouble with McFadden when the latter seized a shot gun and threatened to kill the officer as he was attempting to arrest another person. The deceased was arrested at that time and taken before the County Judge who declined to comply with the Constable's request that McFadden be charged with an assault with a deadly weapon, or some kindred felony. Instead, the County Judge charged McFadden merely with the misdemeanor of having been drunk and disorderly. It was said to have come thereafter to the defendant's ears that McFadden had stated on more than one occasion that he intended to kill defendant, and it was in evidence that he attempted to buy a pistol with the expressed purpose of getting in readiness to carry out that threat.

The defendant, nursing his wrath, and being resentful of certain vile and opprobrious epithets which McFadden was said to have applied several times to him, and being also apprehensive of harm at McFadden's hands, and perhaps deeming the law, as administered by the County Judge, inadequate—so it is argued—took matters into his own hands.

Riding with his nephew in an automobile belonging to the latter, on the night of September 21, 1945, he stated, according to that nephew, that he was "going to get McFadden if he was drunk." Later that night he located the Negro, took him by the arm, guided him without effort or resistance to the nephew's car, and had him take the rear seat. The nephew, who testified that McFadden "looked like he was drunk," declined to swear positively whether he was or not. Other witnesses saw no evidence whatsoever of inebriation on the part of the deceased.

We shall skip the shocking details of the beating that Crews administered with a bull whip after the taking of McFadden into custody and come to the ultimate act of personal venom and hate, or of the vicious exercise of official despotism and cruelty—depending upon how one views the evidence.

After directing his nephew to drive the automobile toward Live Oak, the county site, Crews also directed him to stop at the home of one Cribbs, who lived outside Branford on the road to Live Oak. Cribbs then became a passenger in the car. Instead of placing McFadden in jail when they reached Live Oak, the defendant directed his nephew to drive to a highway bridge several miles west of the county site and some thirty miles up the river from Branford. Before reaching the bridge the defendant stated that he was going to give McFadden a fifty-fifty chance, but notwithstanding McFadden's protestations that he could not swim, the Constable forced him to jump from the high bridge into the deep, swift current of the river, from which he never came out until he was taken from the water and the willows by the undertaker.

There was evidence that, as Town Marshal, the appellant, when on duty, regularly wore a cap denoting his position, and that at the time of taking McFadden into custody he was without this cap, which he considered as the symbol of his official authority and without which, it was argued, he considered that he was not on duty. There was evidence that Crews, unofficially, or without formal or official sanction from the Town, frequently procured one Lee to take his place, during which period, it was also asserted, Crews considered himself not to be on duty as Town Marshal. There is also evidence that Crews had on no uniform or badge as the Town ordinance was said to require, and that he was riding in no official police car. From these circumstances it was argued that Crews considered he was off duty at the time. As Constable there was no requirement of cap, badge, or uniform, nor limitation of hours. He was always on call.

It was not shown that Crews accused McFadden of being drunk at the time of taking him into custody, nor that he ever stated to the deceased that he was under arrest. He had no warrant for the arrest of McFadden. None was necessary if he were drunk in the officer's presence.

Counsel for the appellant concedes that the evidence is sufficient to establish the commission of the homicide of McFadden by Crews with all of its heartless cruelty; but he earnestly and ably insists that the act was solely one of personal vengeance

and entirely devoid of official character or authority and, therefore, not within the purview of the statute under which the indictment was drawn. He insists that the following testimony by Barber, the Constable's nephew, as they rode in the automobile of the latter in the earlier part of the night in question,

"Q. What, if anything, did he say to you just before you started out with reference to McFadden? A. I believe he told me he was going to get him if he was drunk"

plus the testimony of Barber that McFadden "looked like he was drunk," was all of the testimony on the vital question of whether defendant was acting under color of law, and that such evidence was wholly insufficient, in the light of all the other facts in the case, to justify the jury in making the requisite finding that Crews was acting under "color of law." [3]

It is also vigorously urged upon us that the vital question of whether or not the defendant was acting under color of law in the deprivation of the constitutional right of McFadden to life or liberty or to a fair trial under due processes of law rather than a trial by ordeal, is supported only by circumstantial evidence of too weak a character to overcome every other reasonable hypothesis other than that the defendant was acting under color of law.

With equal earnestness defendant's counsel also impresses upon us that this same circumstantial evidence entirely fails to meet the standard set by the Supreme Court in Screws v. United States, supra [325 U.S. 91, 65 S.Ct. 1038], wherein that court said:

"But in view of our construction of the word 'willfully' the jury should have been further instructed that it was not sufficient that petitioners had a generally bad purpose. To convict it was necessary for them to find that petitioners had the purpose to deprive the prisoner of a constitutional right, e. g. the right to be tried by a court rather than by ordeal. And in determining whether that requisite bad purpose was present the jury would be entitled to consider all the attendant circumstances—the malice of petitioners, the weapons used in the assault, its character and duration, the provocation, if any, and the like."

It is unnecessary for us to enter into an extended discussion of the legal principles involved in this case for they have been set forth by the Supreme Court in a recent decision in Screws v. United States, supra.

Concededly, the defendant was actuated by a spirit of revenge, of personal malice, perhaps of fear of personal harm at the hands of McFadden. His chastisement of the deceased with the bull whip until he broke it, prior to the time he forced McFadden to jump to his death, furnishes convincing evidence that Crew's personal anger and desire for vengence were intense. Nevertheless, if he, as Constable or as Town Marshal, arrested McFadden or took him into custody because he was drunk, or because he believed that he was drunk, or if he, while acting under color of his authority as Town Marshal or Constable, took McFadden into custody on the pretense that he believed him to be drunk, and, while having him in such custody, determined that instead of granting to his prisoner the constitutional right of a lawful trial he should be tried by ordeal, and in pursuance of which he committed the acts alleged, the offense charged would be complete even though the defendant was *also* actuated by personal anger, hate, malice, and a desire for revenge. If in the use of his official authority under color of law an officer vents his malice upon a prisoner and deprives him of a constitutional right, this manifestation and use of personal

---

[3] § 52, 18 U.S.C.A., is as follows:

"Depriving citizens of civil rights under color of State laws. Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

spleen need not necessarily negative the fact that such officer might at the same time have also acted with the conscious and willful purpose of depriving the prisoner of constitutional rights. Conversely, one cannot willfully deprive another of the constitutional right to life without having the willful intent to slay.

There is direct evidence: (a) That Crews intended to arrest McFadden if he were drunk; (b) that McFadden looked like he was drunk; (c) that Crews, upon finding McFadden, took him into custody and thereafter did not place him in jail, prefer any charge against him, nor take him before any judicial officer or tribunal. Instead, he put his prisoner through an ordeal that brought about the latter's death.

■ An officer of the law should not be permitted to divest himself of his official authority in actions taken by him wherein he acts, or purports, or pretends, to act pursuant to his authority, and where one, known by another to be an officer, takes the other into custody in a manner which appears on its face to be in the exercise of authority of law, without making to the other any disclosure to the contrary, such officer thereby justifies the conclusion that he was acting under color of law in making such an arrest.

■ It was the function of the jury, as the fact-finding body of the Court, to consider all the facts and circumstances in evidence, meanwhile weighing preponderances, drawing inferences, comparing presumptions, probing intent, and balancing hypotheses. It is not necessary, in order to uphold a jury's verdict, that this Court concur in every fact found by the jury but merely that it determine that a jury question was involved and that there was competent and substantial evidence to support the jury's verdict.

■ The question of intent in a case of this sort must of necessity be one for the jury to determine from all the facts and circumstances in evidence. It is not given to a jury to look into a man's mind and read its purposes, but the jury may probe into his words, his knowledge, his experience, his surroundings, his acts and doings and their results, in order to decide the question of intent. An officer of the law undoubtedly knows that a person arrested by him for an offense has the constitutional right to a trial under the law, and if the jury should believe from the evidence beyond a reasonable doubt that such an officer willfully failed to accord to one arrested by him the opportunity for such a trial but substituted instead his own trial by ordeal, such jury would be justified in finding that such a denial of such constitutional right was consciously and willfully made. One is generally presumed to have intended the normal and reasonable consequences of his acts. A deprivation of the right to life is an inexorable and concomitant consequence of a willful homicide.

We think the charge of the lower Court was fair, full, and able, in the giving of which the Court followed with unfaltering accuracy the law as laid down by the Supreme Court in Screws v. United States, supra.

The other specifications of error are not such as in our opinion require a reversal of this case.

The judgment of the lower Court is affirmed.