**UNITED STATES v. LYNCH et al.**

Crim. No. 3876.

United States District Court
N. D. Georgia, Rome Division.

Feb. 16, 1950.

J. Ellis Mundy, U. S. Atty. for the Northern District of Georgia, Atlanta, Ga., Raymond W. Martin, Special Asst. to U. S. Atty. for the Northern District of Georgia, LaGrange, Ga., for plaintiff.

Frank M. Gleason, Paul W. Painter, Rossville, Ga., for defendants.

HOOPER, Chief Judge.

There are three counts in this indictment, each naming ten defendants. As verdicts of guilty were returned only under Count Two and against only Sheriff John William Lynch and Deputy Sheriff William M. Hartline, the questions of law are considerably narrowed. This opinion covers defendants' plea of former jeopardy, motion to dismiss the indictment, and motion for a new trial under Count Two.

(1) *Plea of Former Jeopardy.* A former trial of these defendants lasted something over five weeks and resulted in a mistrial. A new indictment was returned, apparently to meet the ruling of the Circuit Court of Appeals in the case of Williams v. United States, 5 Cir., 179 F.2d 644, certiorari granted 71 S.Ct. 77, construing Sec. 241, Title 18, United States Code Annotated, which involves conspiracy to violate civil rights. The new indictment predicated the conspiracy count upon Section 371, Title 18, United States Code Annotated, rather than upon Section 241, which had been held inapplicable.

This plea of former jeopardy did not complain that the jury on the former trial was not given ample time in which to make a verdict. As a matter of fact, that jury deliberated more than forty-eight hours without a vote being changed. A mistrial was declared, and the government was at liberty to obtain a new indictment. Keerl v. State of Montana, 213 U.S. 135, 29 S.Ct. 469, 53 L.Ed. 734.

(2) *Contents of the Indictment.* Though all defendants were acquitted under Count One (the conspiracy count), the questions of law raised thereunder on the motion to strike it will be covered, as they control the questions raised under Count Two.

Count One charges a conspiracy on the part of four officer defendants, six other named defendants, and a group of unknown persons belonging to the Ku Klux Klan (and at times mentioned dressed in its regalia) to commit deprivations of civil rights. The charges will be best understood by considering the three classes of intended victims of the conspiracy.

One group consisted of white inhabitants of Dade County. It is charged that defendants, together with members of the Klan, would visit their residences and under color of law and without due

process of law, commit assault and battery, illegal search and seizure and invasion of their right of privacy, and other acts.[1]

■ The second group of alleged victims were seven Negro men who were at the home of Mamie Clay near Hooker when the cross was burned; the fact that they were Negroes is legally immaterial, for Section 242 covers all inhabitants of states. Defendants planned to proceed to the house of Mamie Clay, arrest the inhabitants,[2] and deliver them to a hooded band who would subject them to punishment by ordeal. These substantive acts form the basis for Count Two, upon which there was a conviction.

Another contemplated victim was Mamie Clay, the plan being to intimidate her by burning a cross near her residence, invading the privacy of her home and subjecting it to illegal and unreasonable search, and by intimidation causing her to abandon her house and depriving her of her rights to hold said property. On Count Three, charging the above as substantive acts, there was an acquittal of all defendants.

■ (3). *Violation of Civil Rights Statute by Private Individuals.* It was insisted by movants that the six named defendants who were not officers of the State could not violate this civil rights statute because it related only to deprivations by a state. True, Section 242 was enacted pursuant to the Fourteenth Amendment and relates to deprivations by states (acting through state officials) and not to acts of private individuals. It does not follow, however, that private individuals cannot be guilty as principals if they aid and abet state officers in such violations. Section 2, Title 18, United States Code Annotated.

Thus, in the case of United States v. Trierweiler, D.C., 52 F.Supp. 4, the court pointed out that it is immaterial that a private citizen may not have the capacity to commit the offense, if he aids an officer to do so. In other civil rights cases under Section 242 private individuals have been joined as defendants. Williams v. United States, 5 Cir., 179 F.2d 644; Williams v. United States, 5 Cir., 179 F.2d 656. The same principle is applied in other cases. Haggerty v. United States, 7 Cir., 5 F.2d 224 (aiding a prohibition agent); United States v. Orr, D.C., 223 F. 220, 222 (aiding a manufacturer of oleomargarine).

■■ (4). *As to Color of Law.* It is ruled above that private citizens who aid and abet state officers may be guilty under Sec. 242. The next element to be shown is that such individuals, though not officers, were acting under color of law.

In civil rights prosecutions under Section 242, Title 18, United States Code An-

---

1. Serious doubt arises whether violation of the Fourth Amendment comes within the purview of due process under the Fourteenth Amendment and therefore within the purview of the civil rights statute, Sec. 242, Title 18, U.S.C.A. The right of privacy existed prior to the adoption of the United States Constitution. D. C. v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, 17. It is protected by the laws of a great many of the individual states which prescribe punishment for its violation. See notes appended to case of Wolf v. People of State of Colorado, 338 U.S. 25, 27, 28, 69 S.Ct. 1359, 93 L.Ed. 1782, which indicates such violations should be punished by the states only. Furthermore, the language of the Fourth Amendment concerning "unreasonable searches and seizures" and "probable cause" is vague and indefinite as a basis for criminal prosecution. It is yet to be seen whether the United States Su-

preme Court will at some future time adopt the policy used in the case of Screws v. United States, 325 U.S. 91, 94, 65 S.Ct. 1031, 89 L.Ed. 1495, of letting willful intent supply certainty to the statute.

2. There are cases holding false imprisonment (false arrest) may be the basis of civil rights prosecution under unusual circumstances. See Howell v. Gray, D. C., 9 F.R.D. 544(7); Watkins v. Oaklawn Jockey Club, D.C., 86 F.Supp. 1006 and cases cited. The same problems as to vagueness referred to above attaches to such cases, for the arrest is lawful if the officer "reasonably suspects" commission of a crime. See State of Missouri v. Fidelity & Deposit. Company, 8 Cir., 179 F.2d 327, 331. Decision of that question is not necessary in this case, as the conspiracy added other acts, and there was a verdict of not guilty under Count Three.

notated, it must appear that defendants were acting in the name and for the state, that they were clothed with the state's power, and that their acts were those of the state. Screws v. United States, 325 U.S. 91, 94, 109, 65 S.Ct. 1031, 89 L.Ed. 1495. Count One of this indictment charged among other things that the officer defendants conspired with the other defendants to go to the residence of Mamie Clay, arrest the inmates and turn them over to a hooded group in disguise to be beaten. Count Two charges the above as substantive acts. The conspiracy contemplated that in all of the foregoing the officers of the law would act in concert with the other named defendants and with unknown hooded and disguised persons.

While it is true that one must be acting under color of state law in order to violate Section 242, and that ordinarily a private citizen would not act under color of law, it is also true that the presence of state officers and their active participation with other defendants who were not officers would furnish the "color of law" required as to all the defendants. This is ruled in Williams v. United States, 5 Cir., 179 F.2d 656, 658, involving a conviction under Section 242. In that case it appeared that a policeman of the City of Miami named Ford "was present during the beatings and maltreatment of the suspects, although it did not appear that he actually participated in the assaults or that he personally administered any beatings to these suspects." Defendant Williams had brought the suspects into the presence of Ford (the city policeman) aided by other persons who were not officers, and they were beaten by the latter. It was there contended "that the Fourteenth Amendment, as implemented by Section 20 of the Criminal Code (now Section 242, Title 18 U.S.C.A., was not intended to bring before the Federal Courts unlawful acts of individuals or state officers unless such acts were authorized by the State". The court disposed of the question with the following statement: "In the present case the policeman, Ford, although not in uniform, was present in an official capacity as a policeman of the City of Miami, acting under the authority of the city and giving, under our holding in Crews v. United States, supra [5 Cir., 160 F.2d 746, 750], official color to the investigation. * * * Williams, * * * who personally committed most of the assaults and did most of the beating, did so in the presence of this duly constituted, or lawful, officer, who, at least, lent color of law to the occasion."

This ruling as to the motion to strike Count One disposes of this same question as to color of law in so far as it is also involved under Count Two, upon which there was a conviction.

**▆▆▆** (5). *Nature of Rights Involved.* No Federal rights, constitutional or otherwise, are involved under Count Two of this indictment, save only those rights embraced in that portion of the Fourteenth Amendment that reads as follows: "Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The only rights involved under the above are these: The rights of persons under state arrest not to be deprived of their personal security (which is embraced within the word "liberty") except in accord with due process of law, and also the rights of such persons to equal protection of the laws. "Equal protection of the laws" in turn includes the right to be tried and punished in the same manner as others accused of crime are tried and punished, the right to protection from injury from the officers having them in charge, and the right of protection by the officers from injury sought to be inflicted upon such prisoners by third parties. Only as to the last named right does this case present any feature not already adjudicated. These rights will be discussed below.

**▆▆▆** (6). *Right to Due Process.* An officer of the law who, having a prisoner in his custody, unlawfully assaults and beats the prisoner, thereby substituting trial by ordeal for trial by due process of law, if acting with willful intent, may be found guilty under Section 242, Title 18 U.S.C.A. "It is plain that basic to the concept of due process of law in a criminal case is a trial—

a trial in a court of law, not a 'trial by ordeal.' \* \* \* Those who decide to take the law into their own hands and act as prosecutor, jury, judge, and executioner plainly act to deprive the prisoner of the trial which [the Constitution of the United States] guarantees him." Screws v. United States, 325 U.S. 91, 106, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495.

■ (7). *Right to Equal Protection of the Laws.* Persons under arrest are entitled equally with other persons under arrest, to a trial by due process, and when found guilty, they are subject to the same punishments. A prisoner unlawfully beaten by an arresting officer is denied the right of due process of law and also right of equal protecti᷒ of the laws. Screws v. United Stat᷒ s, supra; Crews v. United States, 5 C᷒ 160 F.2d 746.

■ would seem, however, that "equal ᷒rotection of the laws" relates not only ι᷒ the right of protection from the officer himself, but also relates to the right of protection due the prisoner by the arresting officers against injury by third persons. Among the rights protected by Section 242 is the right of protection "from mob action incited or shared by state officers; from failure to furnish police protection on proper occasion and demand".[3] It may be that "failure by inaction to discharge official duty" may constitute denial of equal protection of the law. See Screws v. United States, 325 U.S. at page 127, 65 S.Ct. at page 1046, citing Catlette v. United States, 4 Cir., 132 F.2d 902. Here, however, the courts must proceed with extreme care, for it would be clearly erroneous and manifestly unfair to law enforcement officers to rule that they are guilty of a violation of Section 242 merely because prisoners in their custody are taken from their custody and assaulted. That is not the law. It must appear beyond a reasonable doubt that the officer's dereliction of his duties, whether of omission or commission, sprang from a willful intent to deprive his prisoner of the rights above enumerated, or one of them.

The indictment in this case is not predicated upon any alleged assault or battery of the prisoners by the officers themselves, it is based upon the alleged surrender by the officers of the prisoners to a group of persons disguised in Klan regalia to be beaten by the latter, and their beating by the latter. A situation somewhat similar existed in the case of Catlette v. United States, 132 F.2d 902, supra, wherein the court said:

"Since the failure of Catlette to protect the victims from group violence or to arrest the members of the mob who assaulted the victims constituted a violation of his common law duty, his dereliction in this respect comes squarely within the provisions of [Section 242, 18 United States Code Annotated]." See Heflin v. United States, 5 Cir., 132 F.2d 907.

As the above statement does not include the necessity of willful intent upon the part of the officer in failing to perform his common law duties of protecting the prisoner, the court, in the instant case, modified such language in the instructions to the jury, and, after stating the duties of sheriffs under the common law and the Georgia laws (as to summons of a posse, etc.) cautioned the jury to consider such laws as bearing upon the willful intent of the officers at the time and place in question. This instruction was given for the further reason that in the instant case the officers claimed they surrendered the prisoners to the mob because of threats by the latter and in the belief that any other course of action would result in even more violence and injury. This defense was given in charge to the jury.

The jury was instructed that the officers were not being tried for false arrest nor for breach of official duty, and could be found guilty only if it was proven beyond a reasonable doubt that they delivered the prisoners in their charge to the hooded mob with willful intent that the prisoners would be beaten by the latter.

■ (8). *The Evidence Supports the Verdict.* The only verdict of guilty in

---

3. Statement by Mr. Justice Rutledge in Screws v. United States, 325 U.S. at page 126, 65 S.Ct. at page. 1048.

this case was rendered against Sheriff Lynch and his Deputy Sheriff Hartline under Count Two, based upon their alleged surrender of prisoners to the mob to be beaten, as just above discussed. There was evidence from which the jury was authorized to find.

Sheriff Lynch and his three deputies had attended various meetings of the Ku Klux Klan and at some of these meetings plans were made for the two cross burnings. Notices of one or more meetings were sent to defendants Lynch and Hartline, and the latter personally aided in the building of a cross and its transportation to Hooker where it was erected and burned near the residence of Mamie Clay. On the night in question all four of these officers arrived at Hooker at about the same time the Klansmen arrived. While good cause existed for the arrest of one Negro who was drunk on the highway, no grounds were shown for the arrest of the other Negro men who were called out from the house of Mamie Clay. At the time of their arrest one of them appealed to Sheriff Lynch for protection but the Sheriff only walked away. These officers participated in or at least consented to, these Negroes being placed in cars and carried off a short distance from the home of Mamie Clay where they were taken from the cars, one at a time, and beaten. Following this the Klansmen returned to Trenton, as did also these officers, where they mixed and mingled together. No arrests were made at that time, nor attempted to be made. While several witnesses testified they were approached by the Sheriff as to becoming members of a posse, none of them ever received any definite instructions and no posse was formed. After ceremonies at a public speaking in Trenton the Klansmen proceeded to Signal Mountain for a second cross burning, and the four defendant officers followed them to that point. At that point no arrests were made, no persons in disguise were identified by them, and no license numbers of automobiles were obtained. All the facts and circumstances present a picture of complete cooperation between defendant officers and the Klansmen, more than amply justifying a finding

by the jury that the prisoners were not taken from defendant officers by threat or intimidation, but on the other hand, were voluntarily surrendered to the Klansmen to be beaten by the latter. It is utterly inconceivable that this Sheriff of a small rural community did not at least recognize a large number of these disguised men and condone their acts.

The special grounds of the motion for a new trial do not require discussion. The plea of former jeopardy, the motion to dismiss the indictment, and the motion for a new trial have each been denied by orders entered in the case.