**JOHNSON v. MATTHEWS, United
States Marshal.**

No. 10425.

United States Court of Appeals
District of Columbia Circuit.

Submitted January 16, 1950.

Decided May 1, 1950.

Mr. Philip E. Shapiro, Washington, D. C., for appellant.

Mr. Richard M. Roberts, Assistant United States Attorney, Washington, D. C., with whom Mr. George Morris Fay, United States Attorney, and Mr. Joseph M. Howard, Assistant United States Attorney, Washington, D. C., were on the brief, for appellee.

Before CLARK, PRETTYMAN and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant is a fugitive from justice in the State of Georgia. He was found in the District of Columbia. The executive authority of Georgia, producing a copy of an indictment charging him with a crime there, and identifying him as the person indicted, demanded his return. He was arrested and, after a hearing, his delivery to an agent of the State of Georgia was ordered. Thereupon he presented to the United States District Court for the District of Columbia a petition for a writ of habeas corpus. In the petition he alleged that he had been arrested and jailed in Georgia for robbery; that for ten months he was given no preliminary hearing, indictment [1] or trial; and that he thereupon escaped. He alleged that during his incarceration elected local officials "expended every effort" to obtain a sum of money from his wife; that during those months he was moved to three jails, where he was the victim of cruel, barbaric and inhuman treatment, in that he was most severely beaten, starved, and denied clothing or bedding by his jailers, placing his life and health in grave jeopardy. He alleged violations of the Fourteenth Amendment to the Constitution of the United States and certain sections of the Constitution of Georgia. On argument he claimed violations of the Sixth Amendment and of the Bill of Rights generally. The District Court denied the petition after hearing oral argument but declining to hear evidence upon the facts alleged as to the treatment in Georgia. This appeal followed.

Article IV, Section 2, clause 2, of the Constitution provides: "A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

The Constitution had hardly been adopted when dispute arose over the requirements of that provision. Pennsylvania was the demanding state and Virginia the state of asylum in a controversy which went to President Washington, from him to Attorney General Edmond Randolph, and from him to the Congress.[2] On February 12, 1793, an act [3] was approved which became Section 5278 of the Revised Statutes and has remained in effect with minor changes ever since. As it presently appears as Section 3182 of Title 18, United States Code Annotated, it reads: "Whenever the executive authority of any State or Territory demands any person as a fugitive

---

1. This allegation was false on the face of the papers. He was arrested January 5, 1948. A certified copy of an indictment returned against him on February 16, 1948, is among the extradition papers.

2. See 2 Moore, Extradition c. II (1891).

3. 1 Stat. 302.

from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District, or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged."

In extradition matters in this jurisdiction, the Chief Judge of the United States District Court for the District of Columbia exercises the functions exercised by the executive authority of a state.

■ *Habeas corpus* is the proper process for testing the validity of the arrest and detention by the authorities of the asylum state for extradition purposes. But a petition for a writ for that purpose tests only that detention; it does not test the validity of the original or the contemplated incarceration in the demanding state. The Supreme Court has established the scope of the extradition inquiry and the issues which are presented by it.[4] The state cases and other federal court cases upon the subject are myriad. In essence the rule is that the court may determine whether a crime has been charged in the demanding state, whether the fugitive in custody is the person so charged, and whether the fugitive was in the demanding state at the time the alleged crime was committed.

■ The question before us is whether a court (either state or federal) in the asylum state can hear and determine the constitutional validity of phases of the penal action by the demanding state in respect to the fugitive or his offense. We think that it cannot do so. Authorities, sound theory of government, and the practical aspects of the problem all require that conclusion.[5]

The problem is not merely one of *forum non conveniens*. It involves the interrelationship of governments, both among the states and between the states and the Federal Government. The quoted provision of the Constitution is in the nature of a treaty stipulation between the states, and compliance is a matter of agreed executive comity. In Appleyard v. Massachusetts[6]

4. Compton v. Alabama, 1909, 214 U.S. 1, 29 S.Ct. 605, 53 L.Ed. 885, 16 Ann.Cas. 1098; Ex parte Reggel, 1885, 114 U.S. 642, 5 S.Ct. 1148, 29 L.Ed. 250; In re Strauss, 1905, 197 U.S. 324, 25 S.Ct. 535, 49 L.Ed. 774; Hyatt v. New York ex rel. Corkran, 1903, 188 U.S. 691, 23 S.Ct. 456, 47 L.Ed. 657; Biddinger v. Comm'r of Police, 1917, 245 U.S. 128, 38 S.Ct. 41, 62 L.Ed. 193; Roberts v. Reilly, 1885, 116 U.S. 80, 6 S.Ct. 291, 29 L.Ed. 544; Whitten v. Tomlinson, 1895, 160 U.S. 231, 16 S.Ct. 297, 40 L.Ed. 406; Munsey v. Clough, 1905, 196 U.S. 364, 25 S.Ct. 282, 49 L.Ed. 515; People of State of Illinois ex rel. McNichols v. Pease, 1907, 207 U.S. 100, 28 S.Ct. 58, 52 L.Ed. 121; Drew v. Thaw, 1914, 235 U.S. 432, 35 S. Ct. 137, 59 L.Ed. 302.

5. 2 Story Constitution § 1809 (5th ed. 1891): "But, however the point may be as to foreign nations, it cannot be questioned that it is of vital importance to the public administration of criminal justice, and the security of the respective States, that criminals who have committed crimes therein should not find an asylum in other States, but should be surrendered up for trial and punishment. It is a power most salutary in its general operation, by discouraging crimes and cutting off the chances of escape from punishment. It will promote harmony and good feelings among the States, and it will increase the general sense of the blessings of the national government. It will, moreover, give strength to a great moral duty, which neighboring States especially owe to each other, by elevating the policy of the mutual suppression of crimes into a legal obligation. Hitherto it has proved as useful in practice as it is unexceptionable in its character."

6. 1906, 203 U.S. 222, 227–228, 27 S.Ct. 122, 124, 51 L.Ed. 161, 163, 7 Ann.Cas. 1073.

the Supreme Court said: "The constitutional provision relating to fugitives from justice, as the history of its adoption will show, is in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several states, —an object of the first concern to the people of the entire country, and which each state is bound, in fidelity to the Constitution, to recognize. A faithful, vigorous enforcement of that stipulation is vital to the harmony and welfare of the states. And while a state should take care, within the limits of the law, that the rights of its people are protected against illegal action, the judicial authorities of the Union should equally take care that the provisions of the Constitution be not so narrowly interpreted as to enable offenders against the laws of a state to find a permanent asylum in the territory of another state."

While the provision of the Constitution, being specific in its reference to "State", may not apply to the District of Columbia, the same basic theory underlies the federal statute which clearly does apply. Both Constitution and statute are explicit and mandatory. They require—not merely suggest—that the fugitive, having been secured, be delivered to the demanding state.

The law of nations, absent treaties, contemplates that every nation control the entrance *vel non* of persons into its borders; those whom it wishes to stay, stay.[7] Since almost every nation wishes, however, to enforce its criminal laws without nullification by the criminal through the simple expedient of leaving the country, treaties of extradition are general throughout the world.[8] The complete chaos which would have enveloped law enforcement in the American colonies in the absence of extradition agreements became evident long before the Constitution was written. Such an agreement was incorporated in the Articles of Confederation.[9] Without debate it was continued in the Constitution.[10]

■ The Federal Government has no function in this interstate arrangement, except that its courts may see, upon petition for *habeas corpus,* that the states abide the compact; and, of course, its territories must obey the statute. To say that the federal courts may interpose in this process their judgment of the internal processes of the states and the fidelity of their officials to their duties, is to nullify the agreement embedded in the Constitution and to reestablish the rule of the law of nations which it was intended to disestablish. The federal courts have no power to nullify a provision in the Constitution.

Of course, appellant has a right to test in a federal court the constitutional validity of his treatment by Georgia authorities. But that test cannot come as a part of the constitutional process of returning a fugitive to the state where he is charged. If this fugitive's constitutional rights are being violated in Georgia, he can and should protect them in Georgia. Not only state courts but a complete system of federal courts are there.

The basic premise of appellant's position is that he could not get fair treatment in the courts of Georgia, either state or federal. Every argument in support of power in the District of Columbia court to consider and determine whether appellant should be released because of anticipated ill-treatment by executive officers of Georgia comes in the final analysis to the essential proposition that appellant's rights would not be protected by the courts of Georgia. Those courts are there. They are charged with the duty of protecting this prisoner and any other in custody in that state. If they perform that duty, appellant would be as ad-

7. 2 Hyde, International Law 1012, 1015 (2d rev.ed.1945). See also 1 Curtis, Constitutional History of the United States 605–606 (1889); 2 Story, op. cit. supra note 5, § 1808 n. (a); 1 Cooley, Constitutional Limitations 52 (8th ed.1927).

8. 2 Hyde, op. cit. supra note 7, at 1016 et seq.

9. Art. IV, par. 2.

10. 2 Story, op. cit. supra note 5, § 1807; 1 Curtis, op. cit. supra note 5, at 601–604; 1 Elliot, Debates 229, 272, 304 (2d ed. 1888).

equately protected by their order as he would be by an order of the court here; he would have no basis for applying to the court here.

We are asked to assume that appellant would not be protected by the courts in Georgia. We not only decline to make the assumption but we repudiate the suggestion that we make it. We will not impugn either the capacity or the integrity of the state courts of Georgia or of any other state. And even if we were to assume, upon the basis of this fugitive's allegations, that the state courts are impervious to his assertions, we would make no such assumption concerning the federal courts having jurisdiction in that state. Those courts of the United States are as capable and faithful as are the courts of this or any other jurisdiction. If that Court of Appeals errs, *certiorari* to the Supreme Court will lie.

If we will not assume the non-availability of courts in Georgia, we are asked to permit petitioner to present evidence upon that non-availability and then to determine the question. There is an established procedure for the correction of error or dereliction on the part of every court in the country, and where constitutional rights are involved the Supreme Court of the United States stands watchman over every court, state or federal. It would be an act of unwarranted arrogance for us to ascribe to ourselves virtue superior to that of other courts and so to assert power to hear and determine the faithfulness to duty of a sister court occupying a place like ours in the federal system. We have not the slightest semblance of authority over such courts. We might differ with them in opinion, but to us the availability of the Georgia federal courts to protect appellant is not "merely a presumption".

Since we have no power to make a presumption or a finding one way or the other upon the virtues or the vices of other Courts of Appeals and since we will not usurp that power, it is of no moment that we should remark upon the subject. But it seems not inappropriate for us to comment that reported cases show the United States Court of Appeals for the Fifth Circuit to be as zealous in protection of the constitutional rights of persons within its borders as is any other Court of Appeals. It was the United States District Court for the Middle District of Georgia which convicted and sentenced to the penitentiary one Screws, a sheriff, for beating a prisoner. The Fifth Circuit affirmed that conviction [11] upon constitutional principles, the Supreme Court reversing [12] on the ground that the statute [13] required a specific intent to deprive a person of a federal right and that an unnecessary beating alone is not sufficient for conviction. It was the same District Court which awarded damages to a Negro voter against the officials of a party primary election for denying the voter the right to participate in a primary, the court holding such deprivation to be a violation of rights under the Fourteenth, Fifteenth and Seventeenth Amendments; [14] and the Court of Appeals for the Fifth Circuit affirmed that judgment.[15] It was the same Court of Appeals which, in Crews v. United States,[16] affirming a conviction under the federal statute making criminal a deprivation of constitutional rights under color of law, condemned that statute as "inadequate". The list of cases could be expanded.

Appellant cites the authorities which hold that if the facts alleged in a petition for *habeas corpus* are such that, if established, they would require issuance of the writ, he must be afforded opportunity

---

11. Screws v. United States, 1944, 140 F.2d 662.

12. Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330.

13. Sec. 20 of the Criminal Code, 18 U.S.C.A. § 52 [now § 242].

14. King v. Chapman, D.C.1945, 62 F.Supp. 639.

15. Chapman v. King, 1946, 154 F.2d 460, certiorari denied 1946, 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025.

16. 1947, 160 F.2d 746.

to prove his allegations.[17] We do not deviate from that rule or qualify its unequivocal terms. But, if this appellant proved the facts he alleges in respect to the penal practices of the State of Georgia, he would not be entitled to an order of the federal District Court in this jurisdiction releasing him from a custody which is for extradition purposes only. This District Court has no power to consider and determine the constitutional validity of executive or judicial processes of the State of Georgia. Another court, not this one, has that power.

It is said that this case presents a conflict between provisions of the Constitution. It presents no such conflict. The extradition clause is a procedural provision. It does not impinge upon any substantive right of any individual and does not affect any provision of the Constitution or its Amendments protecting such rights. The provision of the Constitution [18] which provides that trial for a crime committed in Georgia shall be in Georgia does not impinge upon any constitutional right of criminal defendants in Georgia. If an accused in a federal court in Georgia cannot obtain in that district the fair and impartial trial to which he is constitutionally entitled, he applies to that court, not to some other court, for a transfer of the proceeding. That is the federal rule of criminal procedure.[19] That rule does not impinge upon any constitutional right of an accused. No more does the clause of the Constitution which says that a fugitive accused of a crime in Georgia shall be returned there for trial.

The argument pressed upon us on behalf of appellant is susceptible of *reductio ad absurdum.* A fugitive has neither more nor less constitutional rights than has an incarcerated prisoner. If the Georgia courts, state and federal, will not enforce the Constitution as to returned fugitives, they will not do so as to prisoners already in the State. But the rule is settled that *habeas corpus* on behalf of an incarcerated prisoner lies only in the district of his incarceration.[20] If that incarceration be in Georgia, and if we assume, as we are urged to do, that courts in Georgia would not protect a prisoner's rights, we would be compelled to conclude either that prisoners in Georgia cannot get protection or that the rule as to venue of *habeas corpus* does not apply to Georgia. The federal Atlanta penitentiary is in Georgia. If the federal courts there do not enforce the Constitution as to those prisoners, it would seem that the penitentiary ought to be moved, lest a federal court in another jurisdiction, in which some federal official might be caught for service of process, order the release of those prisoners.[21]

It is said that under the doctrine urged upon us in behalf of appellant the fugitive would have to establish by adequate evidence that if returned to the demanding state he would be reasonably likely to undergo cruel and unusual punishment or be deprived of some constitutional right. We are asked to follow the lead of the Third Circuit in Johnson v. Dye.[22] We therefore turn to that case to ascertain the nature of the procedure contemplated. The

17. Walker v. Johnston, 1941, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; In re Rosier, 1942, 76 U.S.App.D.C. 214, 133 F.2d 316; Clawans v. Rives, 1939, 70 App.D.C. 107, 104 F.2d 240, 122 A.L.R. 1436.

18. Art. III, § 2, cl. 3.

19. Federal Rules of Criminal Procedure, rule 21, 18 U.S.C.A.

20. Ahrens v. Clark, 1948, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898.

21. See Johnson v. Dye, infra.

22. 1949, 175 F.2d 250. That case was reversed by the Supreme Court, 1949, 338 U.S. 864, 70 S.Ct. 146, without opinion

and without dissent, upon a single reference, "Ex parte Hawk, 321 U.S. 114 [64 S.Ct. 448]." Ex parte Hawk contained no reference to extradition. It concerned procedure in *habeas corpus* in the federal court having jurisdiction in the state where the petitioner was indicted, convicted, sentenced and incarcerated. The petitioner there was thus confined in the Nebraska State Penitentiary under sentence for murder imposed by a Nebraska District Court. The *habeas corpus* was sought in the United States District Court for Nebraska. The Supreme Court held that he must exhaust his remedies in the courts of Nebraska. Applying the doctrine of that case to

proof there consisted of the testimony of the fugitive himself and that of other escaped convicts and one prisoner incarcerated by Pennsylvania authorities, supported by articles in "Life" and "Time" magazines and the newspaper "P.M." Those witnesses testified that prisoners in Georgia are treated with persistent and deliberate brutality. In so far as "Life" magazine showed that such past abuses had been obliterated, it was contradicted by the witnesses. The State of Georgia offered no testimony. We are told that a similar pattern of presentation may be contemplated in the case at bar and in other similar cases.

That prisoners and fugitives from justice frequently allege beatings and starvation by police or prison officers is demonstrated by reference to almost innumerable cases. Pennsylvania, in the Third Circuit, does not appear to have been immune from these allegations. In Commonwealth v. Brown,[23] a 1933 case, a mulatto boy prisoner claimed that he was denied bread and water for about forty hours and beaten with a blackjack—some 15 or 20 blows—by the Philadelphia police. The trial court ridiculed his evidence as to the brutality, the Superior Court reversing the conviction for that reason. If fugitives from the District of Columbia were to testify in distant states as they sometimes testify in the District Court here, and if they were not contradicted, they would picture frequent and deliberate beatings of prisoners here. Given rein and no prospect of contradiction, and spurred by hope of refuge, fugitives from this jurisdiction would probably describe "revolting barbarities" in the Nation's Capital just as was done in respect to Georgia in Johnson v. Dye, supra.

The State of Georgia failed to appear in Johnson v. Dye, and the same situation might reasonably occur in any similar case. In the first place, the Governor of a demanding state may well believe that a United States District Court in some distant district has no jurisdiction to consider and determine the constitutionality of the penal practices of his state. He might decline to concede the contrary or even to appear to do so.

In the next place, the budgets of the states probably do not include funds for the transportation and compensation of lawyers and parties of executive officials to various distant points to combat the testimony of fugitives as to probable penal treatment of returned prisoners. The interests of the citizens may not, in the opinion of the Governor and the Legislature, justify expenditures in large amounts for such purposes, if the asylum state wants to retain the fugitives. The presence of these persons in their state may not be worth any considerable sum of money to them. Having performed their duty under the Constitution by requesting extradition, with a disclosure of the facts concerning the fugitive, they might be content to let the matter rest there, if the asylum state wishes to grant refuge.

It is conceivable that executive authorities in some states might welcome the establishment of areas of refuge distant from their own responsibility to which undesirables might flee and leave no burden of duty upon their home officials. This possibility is suggested in the concurring opinion in Johnson v. Dye. It is there stated that 175 other prisoners escaped at the same time as did Johnson, that one of the other

Johnson v. Dye—and to the case at bar—the petitioner would be required to exhaust his remedies in the courts of Georgia before resorting to the federal courts. If the Supreme Court, in Johnson v. Dye, meant that the petitioner must exhaust his remedies in the Pennsylvania courts (where he was being held for extradition only), it meant that those courts had jurisdiction to entertain, and so to grant, his petition upon the grounds he alleged. That would have been a revolutionary reversal of all the cases ever written upon the subject, and we have serious doubt that the Court intended to accomplish that result without argument and without opinion. Rather it seems more reasonable that the Court meant, by citing Ex parte Hawk, to tell the petitioner to apply first to the state courts of Georgia which had jurisdiction over the executive officials against whom he was complaining.

23. 309 Pa. 515, 164 A. 726, 86 A.L.R. 892.

fugitive witnesses testified that the Warden observed his departure but made no objection, and that the Chief of Police paid his bus fare from Thomasville to Atlanta. Judge O'Connell, in the concurring opinion, observed: "* * * I entertain considerable doubt whether an impenitent Georgia administration would be deeply grieved by a decision which permits Georgia to utilize the other 47 states as penal colonies for its 'escaped' prisoners." [24]

The chaos into which the enforcement of criminal law would be plunged by the doctrine urged upon us by appellant is as readily discernible now as it was when the Colonies first made what is now' the existing agreement. The case before us concerns Georgia. The next might concern Alabama. The question there might be whether casually attended, ununiformed laborers with chains attached to their legs, at work in the open air on country roads, are undergoing cruel and unusual punishment. The next case might concern New York or Illinois, and the question might be whether serried, shaved and numbered robots in the monotony of gray walls, or in occasional solitary confinement in darkened cells on bread and water, are suffering cruel and unusual punishment. And so a pattern of opinion in this jurisdiction concerning the penal practices of all the forty-eight states would in time necessarily develop. The authors of the succinct note on "The Third Degree" in the Harvard Law Review [25] say: "* * * * one is driven to the conclusion that the third degree is employed as a matter of course in most states * * *." The same patchwork of return-or-no-return would develop in each of the forty-eight states as to each of the other forty-seven and the District of Columbia, if the courts of each were to determine for themselves the probable penal treatment in each of the others; and the patchwork would include the rules of each of the federal circuits as to each of the states and each of the other circuits.

The resultant confusion is apparent, and the resultant animosities among states and between the states and the Federal Government are as readily discernible. In the case urged upon us as authority, the Governor and the state courts of the asylum state (the trial court and the court of intermediate appeal, where the case ended) refused to free the fugitive. When application for a writ was made to the federal court, they opposed the petition. The federal appellate court, Judge O'Connell commented, "turn[ed] loose a convicted murderer among the law-abiding citizens of Pennsylvania, a state which ha[d] expressly refused to harbor him." The confusion and the animosity which would result from the course urged upon us are compelling reasons why we should not adopt it, just as they were compelling reasons for the provision in the Constitution in the first place.

We find ourselves in disagreement with the United States Court of Appeals for the Third Circuit in its opinion in Johnson v. Dye.

The judgment of the District Court is Affirmed.

BAZELON, Circuit Judge (dissenting).

Just as certain rights—those of freedom of speech, press, assembly, religion, etc.—have been said to stand in a "preferred position" under our Constitution, so also would I include within that group the right of the individual to be free from cruel and unusual punishment and to be tried for a crime of which he is accused. The latter is to the individual what the former is to the body politic and both must be the object of zealous concern if our concept of liberty is to be preserved. Accordingly, I am unable to agree that this court is barred from inquiring into charges as grave as those made by petitioner here. In expressing this dissent, I am well aware of the factors of history, policy and precedent underlying the position of the majority. But I have been cited to no controlling authority in which this particular question—viz., the availability of extradiction where there has been cruel and unusual punishment or the denial of a right to trial—has been decided.

24. Supra 175 F.2d at page 257.

25. 43 Harv.L.Rev. 617, 618 (1930). See also 1 Am.J.Police Sci. 575 (1930).

The obvious importance of the federal system, and the desire to facilitate its workings, should not obscure the fact that action in pursuance of one constitutional power may run afoul of another. Unless the Constitution is read as a whole, there is grave danger that the extradition process will be executed in unduly mechanistic fashion and in complete disregard of the fundamental considerations of humanity and decency which are reflected in the Bill of Rights. Certainly, the interest of the various governments of our federal system in the orderly workings of the extradition machinery is a factor of moment. And in such interest, it may ordinarily be desirable to limit the inquiry on habeas corpus to the three or four traditional questions posed in such cases. But where one constitutional purpose must be weighed against another —one promoting efficiency and comity between states, the other protecting fundamental rights of the individual against state infringement—our system of government will be better served by assessing greater weight to the latter. Serious doubt concerning the effectiveness of future guarantees of such fundamental rights ought not to be resolved by speculation or presumption that somehow, somewhere, but not here, some court will be able to prevent a repetition of past abuses.

Petitioner's allegations below are that he has been subjected to cruel and unusual punishment and that he has been imprisoned for ten months without being brought to trial. For the purpose of this appeal, we are bound to accept these grave allegations as true. Yet, under the majority view, they may not be considered, regardless of the content petitioner may be able to give to them. Even if petitioner can prove, in a hearing on the merits under these allega-

tions, that he will never get to trial in Georgia, or that he will not get access to *any* court in that state because of the cruel and unusual punishment which may cause his death before that time, his release could not be secured on habeas corpus.

This court rests its conclusion in large part on the availability of the Georgia state courts and of the Georgia federal courts to protect petitioner. It thus raises what is merely a presumption—that the law will follow its ordinary course and that officials will act properly—to the level of a conclusive rule of law. It should be clearly understood that I make no assumption that state or federal courts in Georgia will be unavailable. It is the majority which makes their availability an absolute and bars any attempt on the part of petitioner to show the extent of their unavailability. I would treat the regularity of official action as a rebuttable presumption to be tested in the light of facts, rather than by speculation within the bare frame of pleadings. This view does not entail disrespect for the Georgia state or federal courts, nor any doubt as to their capability, integrity or faithfulness to the Constitution and its Bill of Rights. In fact, it makes the majority's reference to such considerations completely irrelevant. It does, however, take account of the notorious facts concerning recurrent penal practices in many of our states, not alone Georgia. It considers the very real possibility that those courts may never have the opportunity to safeguard rights such as those involved here, that the harm may be done before the judicial process can even be brought into play.

I think we should follow the lead of the Third Circuit in Johnson v. Dye, 3 Cir., 1949, 175 F.2d 250,[1] at least to the extent that it is based on the premise that allega-

1. Reversed per curiam by the Supreme Court in 1949, 338 U.S. 864, 70 S.Ct. 146, citing only Ex parte Hawk, 1944, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572. That case decided that all remedies in the state of detention must be exhausted by one held in the custody of that state before he could petition for habeas corpus in the federal courts. The state there was Nebraska and the attempt was made to get into the federal courts before all

Nebraska remedies had been exhausted. The very same question was involved in Johnson v. Dye. There, too, the petitioner in the United States District Court in Pennsylvania had not exhausted his state remedies—i. e., he had not appealed from the decision of Pennsylvania's Court of Common Pleas, affirmed by the Superior Court, to the state Supreme Court. It was because of this very similarity of issues that the Third Circuit devoted a

tions such as those involved here may be heard on the merits. In that case, petitioner, who had been convicted of murder in Georgia, sought to resist by way of habeas corpus an extradition warrant issued against him in Pennsylvania. He alleged cruel and unusual punishment inflicted on him in a Georgia chain gang and was permitted to argue on the merits. The court, sitting *en banc,* ordered his release, saying: "* * * the right to be free from cruel and unusual punishment at the hands of a State is as 'basic' and 'fundamental' a one as the right of freedom of speech or freedom of religion" [175 F.2d at page 255] and hence was included within the scope of the liberty guaranteed by the Fourteenth Amendment. "The obligation of a State to treat its convicts with decency and humanity is an absolute one and a federal court will not overlook a breach of that duty" [Id., 175 F.2d at page 256]. I disagree with the opinion of the majority in that case, however, to the extent that it makes the fact of *past* infringement alone the basis of release on a petition for habeas corpus in extradition cases. Instead, I would follow the rationale suggested by Judge O'Connell who concurred in part and dissented in part. He felt that the court "need not, and should not, declare that the drastic remedy [release of petitioner] here announced is one which will lie whenever there has been, in the past, an infliction of cruel and unusual punishment. I deem it sufficient that we invoke our power to release an individual who not only has suffered cruel and unusual punishment but also *faces grave and imminent danger of like abuse and very possibly even death by extra-legal means, if he is returned to Georgia.* If * * * this court must choose between past and prospective violation of a basic constitutional right as the ground for release of an individual, I should prefer to place reliance upon the latter [Id. 175 F.2d at pages 258–259]. * * * The logic of invoking the judicial power to eliminate a threatened invasion of a basic constitutional right seems to me irresistible * * *. Could this penalty be served [in Georgia], with observance of those constitutional rights which prisoners retain, * * * I think it would be both unwise and improper for this court to restrain Pennsylvania from honoring a request by Georgia for his extradition" Id. 175 F.2d at page 259. Emphasis supplied.

I would remand the case to the District Court for a hearing on the merits, the objective being to ascertain whether Johnson has suffered the alleged infringements and "would be reasonably likely to undergo similar abuse if he were returned to Georgia" [Id. 175 F.2d at page 259]. It may well be that petitioner will be unable to prove his allegations or to show such facts as would result in his securing relief. His burden of proof would undoubtedly be great. We might be unwilling to accept the sort of proof relied upon by the Third Circuit and referred to by the majority here. But I cannot bring myself to concur in a view which forecloses all opportunity of showing the extent to which basic rights have been infringed. Unless such an opportunity is afforded petitioner, there can be no accurate assessment of competing constitutional considerations.

It is regrettably true that my view, as the majority quotes from Judge O'Connell's opinion in the Dye case, "[might] turn

substantial portion of its opinion to an attempt to carve out an exception to the rule of exhaustion of state remedies in habeas corpus. It was this argument which the Supreme Court rejected by its cursory reference to Ex parte Hawk. The Hawk case had nothing to do with extradition. *It did not involve the question of remedies in a foreign jurisdiction.* To read into a per curiam reversal which is so clearly procedural in origin a repudiation of the substantive decision of the Third Circuit is to depart far indeed

from the Supreme Court's obvious meaning. It is as if this court were held to have tested the merits of allegations which it refuses to consider because of a failure to exhaust administrative remedies.

The doctrine of exhaustion of state remedies in habeas corpus, designed to prevent premature abandonment of state remedies in search of federal relief, is of course inapplicable here in the District of Columbia.

loose a convicted murderer." [2]  Neverthe-
less, I am in thoroughgoing agreement
with Judge O'Connell's further statement:
" * * * better it be that a potentially
dangerous individual be set free than that
the least degree of impairment of an in-
dividual's basic constitutional rights be
permitted" [Id. 175 F.2d at pages 257–258].

2. In the present case, of course, petitioner was accused of robbery and had not yet come to trial.