## MAHON v. JUSTICE.

·APPEAL· FROM THE CIRCUIT COURT OF THE· UNITED STATES FOR
THE DISTRICT OF KENTUCKY.

No. 1411. Argued April 23, 24, 1888. — Decided May 14, 1888.

No mode is provided by the Constitution and laws of the United States by which a person, unlawfully abducted from one State to another, and held in the latter State upon process of law for an offence against the State, can be restored to the State from which he was abducted.

There is no comity between the States by which a person held upon an indictment for a criminal offence in one State can be turned over to the authorities of another State, although abducted from the latter.

A, being indicted in Kentucky for felony, escaped to West Virginia. While the governor of West Virginia was considering an application from the governor of Kentucky for his surrender as a fugitive from justice, he was forcibly abducted to Kentucky, and when there was seized by the Kentucky authorities under legal process, and put in jail and held to answer the indictment. *Held*, that he was not entitled to be discharged from custody under a writ of *habeas corpus* from the Circuit Court of the United States.

THE court stated the case as follows:

On the 9th of February, 1888, the governor of West Virginia, on behalf of that State, presented to the District Court of the United States for the District of Kentucky a petition, representing that during the month of September, 1887, a requisition was made upon him as governor aforesaid, by the governor of Kentucky, for Plyant Mahon, alleged to have committed murder in the latter State, and to have fled from its justice, and to be then at large in West Virginia; that pending correspondence between the two governors, and the consideration of legal questions growing out of the requisition, and during the month of December, 1887, or January, 1888, the said Plyant Mahon, while residing in West Virginia, was, in violation of her laws, and of the Constitution and laws of the United States, and without warrant or other legal process, arrested by a body of armed men from Kentucky, and by force and against his will, conveyed out of the State of

West Virginia into the county of Pike, in the State of Kentucky, and there confined in the common jail of the county, where he has been ever since, and is deprived of his liberty by the keeper thereof.

The petitioner further represented that on the 1st of February, 1888, he as governor of West Virginia and on her behalf, made a requisition upon the governor of Kentucky, that Plyant Mahon be released from confinement, set at large, and returned in safety to the State of West Virginia; and that the demand was, on the 4th of that month, refused on the ground, among others, that the questions involved were judicial and not executive. The petitioner, therefore, in alleged vindication of the rights of the State of West Virginia, and of every citizen thereof, and especially of the said Plyant Mahon thus confined and deprived of his liberty, to the end that due process of law secured by both the Constitution of the United States and the constitution of the State of West Virginia, and the laws made in pursuance thereof, might be respected and enforced, prayed that the writ of *habeas corpus* be granted, directed to the keeper of the jail, commanding him to produce the body of said Plyant Mahon, together with the cause of his detention, before the judge of the court at such time and place as might be designated, and that judgment be rendered that said Plyant Mahon be discharged from said confinement and custody, and be safely returned within the jurisdiction of the State of West Virginia. At the same time another petition was presented to the court by one John A. Sheppard, representing that he was a citizen of West Virginia, and setting forth substantially the facts contained in the petition of the governor, and praying for a like writ of *habeas corpus*. Subsequently the name of Plyant Mahon was substituted for that of John A. Sheppard, and the proceedings on the petition were conducted in his name.

The court ordered the writ to issue, directed to the jailor of Pike County, requiring him to produce the body of Mahon before the District Court of the United States in the city of Louisville on the 20th of the month, and there to abide such order as might be made in the premises. The jailor of the

county, Abner Justice, made a return to the writ substantially as follows: That he held Plyant Mahon in custody and confined in the jail of Pike County by virtue of and in obedience to three writs issued by the clerk of the Criminal Court of the county under its order, each for the arrest of Mahon to answer an indictment pending against him and others for the crime of wilful murder, alleged to have been committed in that county, a crime for the trial of which that court had full jurisdiction, and commanding the officer arresting Mahon to deliver him to the jailor of the county; copies of which writs were annexed to the return; that under the writ of *habeas corpus* he was proceeding to the city of Louisville to produce the body of Mahon before the United States District Court there, when he was met on his way by the United States Marshal of the District of Kentucky, who, by virtue of the order of the District Court, took Plyant Mahon into his custody. He further returned that three indictments against Mahon and others for wilful murder were found by the grand jury of Pike County, Kentucky, and returned into the Circuit Court of said county at its September term, 1882, at which time that court had jurisdiction of the crime charged; that, by order of the court, made at each subsequent term, writs were issued by the clerk thereof for the arrest of Plyant Mahon to answer the indictments, until the Criminal Court of the county was established by act of the General Assembly of Kentucky in 1884, by which the jurisdiction previously vested in the Circuit Court was transferred to and vested in said Criminal Court; that, by orders of this latter court from term to term, writs were issued by the clerk thereof for the arrest of Mahon to answer the indictments; but none of them were executed upon him until January 12, 1888, when he was arrested in Pike County by the sheriff thereof, and delivered by him to the respondent, jailor of said county, in obedience to the writs which were issued, and under the command and authority of which he was held by the respondent as jailor in custody in the jail of said county, when the writ of *habeas corpus* was served upon him

The jailor subsequently, by leave of the court, made a fur-

ther return, in which he stated that a requisition was made by the governor of Kentucky upon the governor of West Virginia for the arrest and rendition to Kentucky of said Plyant Mahon as alleged in the governor's petition; that it was accompanied by a copy of the indictments referred to, certified by the governor of Kentucky to be authentic; that at the same time the governor appointed one Frank Phillips as the agent of the State to receive and bring to the State of Kentucky the said Mahon, as provided by law in such cases; that on the 30th of September, 1887, the governor of West Virginia returned said requisition to the governor of Kentucky, informing him that an affidavit, as required by the statute of West Virginia, should accompany the requisition before the same could be complied with; that thereafter the governor of Kentucky returned the requisition to the governor of West Virginia, accompanied by the affidavit required; that afterwards, about the 12th of January, 1888, Frank Phillips and others, with force and arms, violently seized the said Mahon in the State of West Virginia and brought him against his will into the county of Pike in the State of Kentucky, where the writs mentioned in the correspondent's original return were executed upon him by the sheriff of Pike County; that at that time no warrant for the arrest of Mahon had been issued or ordered to be issued by the governor of West Virginia in compliance with said requisition; and afterwards, on the 30th of January, 1888, he informed the governor of Kentucky that he declined to issue his warrant for the arrest of Plyant Mahon, in compliance with the requisition made upon him, because he had become satisfied, upon investigation of the facts, that Mahon was not guilty of the crime charged against him in the indictments; and that subsequently, on the 1st of February, 1888, the governor of West Virginia made upon the governor of Kentucky a demand for the release of Mahon from the jail of the county of Pike and his safe conduct back into West Virginia, with which demand the governor of Kentucky declined to comply, on the ground that Mahon was in the custody of the judicial department of the Commonwealth, and that the question of his release upon the grounds alleged in the demand

was one which the courts alone could determine, and that the adjudication thereof was not one within the purview of his powers and duties as governor. The facts thus detailed were established before the court on the hearing upon the writ and are contained in its findings.

On the 3d of March the court denied the motion for the discharge of Plyant Mahon, and ordered the marshal to return him to the jailor of Pike County. From this order an appeal was taken to the Circuit Court of the United States and there affirmed. To review the latter order the case is brought here

*Mr. Eustace Gibson* for appellant.

*Mr. J. Proctor Knott* for appellee.

MR. JUSTICE FIELD, after stating the case as above reported, delivered the opinion of the court.

The governor of West Virginia, in his application on behalf of the State for the writ of *habeas corpus* to obtain the discharge of Mahon and his return to that State, proceeded upon the theory that it was the duty of the United States to secure the inviolability of the territory of the State from the lawless invasion of persons from other States, and when parties had been forcibly taken from her territory and jurisdiction to afford the means of compelling their return; and that this obligation could be enforced by means of the writ of *habeas corpus*, as the court in discharging the party abducted could also direct his return to the State from which he was taken, or his delivery to persons who would see that its order in that respect was carried out.

If the States of the Union were possessed of an absolute sovereignty, instead of a limited one, they could demand of each other reparation for an unlawful invasion of their territory and the surrender of parties abducted, and of parties committing the offence, and in case of refusal to comply with the demand, could resort to reprisals, or take any other measures they might deem necessary as redress for the past and security

for the future. But the States of the Union are not absolutely sovereign. Their sovereignty is qualified and limited by the conditions of the Federal Constitution. They cannot declare war or authorize reprisals on other States. Their ability to prevent the forcible abduction of persons from their territory consists solely in their power to punish all violations of their criminal laws committed within it, whether by their own citizens or by citizens of other States.

If such violators have escaped from the jurisdiction of the State invaded, their surrender can be secured upon proper demand on the executive of the State to which they have fled. The surrender of the fugitives in such cases to the State whose laws have been violated, is the only aid provided by the laws of the United States for the punishment of depredations and violence committed in one State by intruders and lawless bands from another State. The offences committed by such parties are against the State; and the laws of the United States merely provide the means by which their presence can be secured in case they have fled from its justice. No mode is provided by which a person unlawfully abducted from one State to another can be restored to the State from which he was taken, if held upon any process of law for offences against the State to which he has been carried. If not thus held he can, like any other person wrongfully deprived of his liberty, obtain his release on *habeas corpus.* Whether Congress might not provide for the compulsory restoration to the State of parties wrongfully abducted from its territory upon application of the parties, or of the State, and whether such provision would not greatly tend to the public peace along the borders of the several States, are not matters for present consideration. It is sufficient now that no means for such redress through the courts of the United States have as yet been provided.

The abduction of Mahon by Phillips and his aids was made, as appears from the return of the respondent to the writ, and from the findings of the court below, without any warrant or authority from the governor of West Virginia. It is true that Phillips was appointed by the governor of Kentucky as agent of the State to receive Mahon upon his surrender on the requi-

sition; but no surrender having been made, the arrest of Mahon and his abduction from the State were lawless and indefensible acts, for which Phillips and his aids may justly be punished under the laws of West Virginia. The process emanating from the governor of Kentucky furnished no ground for charging any complicity on the part of that State in the wrong done to the State of West Virginia.

It is true, also, that the accused had the right while in West Virginia of insisting that he should not be surrendered to the governor of Kentucky by the governor of West Virginia, except in pursuance of the acts of Congress, and that he was entitled to release from any arrest in that State not made in accordance with them; but having been subsequently arrested in Kentucky under the writs issued on the indictments against him, the question is not as to the validity of the proceeding in West Virginia, but as to the legality of his detention in Kentucky. There is no comity between the States by which a person held upon an indictment for a criminal offence in one State can be turned over to the authorities of another, though abducted from the latter. If there were any such comity, its enforcement would not be a matter within the jurisdiction of the courts of the United States. By comity nothing more is meant than that courtesy on the part of one State, by which within her territory the laws of another State are recognized and enforced, or another State is assisted in the execution of her laws. From its nature the courts of the United States cannot compel its exercise when it is refused; it is admissible only upon the consent of the State, and when consistent with her own interests and policy. *Bank of Augusta* v. *Earle*, 13 Pet. 519, 589; Story's Conflict of Law, § 30.

The only question, therefore, presented for our determination is whether a person indicted for a felony in one State, forcibly abducted from another State and brought to the State where he was indicted by parties acting without warrant or authority of law, is entitled under the Constitution or laws of the United States to release from detention under the indictment by reason of such forcible and unlawful abduction. Section 753 of the Revised Statutes declares that "the writ

of *habeas corpus* shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the author-ity of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, pro-cess, or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States."

To bring the present case within the terms of this section it is contended that the detention of the appellant is in violation of the provisions of the Fourteenth Amendment of the Consti-tution, that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law;" and also in violation of the clause of the Constitution providing for the extradition of fugitives of justice from one State to another, and the laws made for its execution.

As to the Fourteenth Amendment, it is difficult to perceive in what way it bears upon the subject. Assuming, what is not conceded, that the fugitive has a right of asylum in West Vir-ginia, the State of Kentucky has passed no law which infringes upon that right or upon any right or privilege or immunity which the accused can claim under the Constitution of the United States. The law of that State which is enforced is a law for the punishment of the crime of murder, and she has merely sought to enforce it by her officers under process exe-cuted within her territory. She did not authorize the unlaw-ful abduction of the prisoner from West Virginia.

As to the removal from the State of the fugitive from jus-tice in a way other than that which is provided by the second section of the fourth article of the Constitution, which declares that " a person charged in any State with treason, felony, or other crime, who shall flee from justice, and be found in an-other State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime," and the laws passed by Congress to carry the same into effect — it is not

perceived how that fact can affect his detention upon a warrant for the commission of a crime within the State to which he is carried.   The jurisdiction of the court in which the indictment is found is not impaired by the manner in which the accused is brought before it.   There are many adjudications to this purport cited by counsel on the argument, to some of which we will refer.

The first of these is that of *Ex parte Susannah Scott*, 9 B. & C. 446.   There it appeared that the prisoner, who had been indicted in the King's Bench for perjury, and for whose apprehension a warrant had been issued, was arrested by the officer, to whom the warrant was specially directed, at Brussels, in Belgium, and conveyed to England.   A rule *nisi* was then obtained from the court for a writ of *habeas corpus*, and the question of her right to be released because of her illegal arrest in a foreign jurisdiction was argued before Lord Tenterden.   He held that where a party charged with a crime was found in the country, it was the duty of the court to take care that he should be amenable to justice, and it could not consider the circumstances under which he was brought there, and that if the act complained of was done against the law of the foreign country, it was for that country to vindicate its own law, and the rule was discharged.

The next case is that of *The State* v. *Smith*, which was very fully and elaborately considered by the Chancellor and the Court of Appeals of South Carolina.   1 Bailey (S. C.), 283.   Though this case did not arise upon the forcible arrest in another jurisdiction of the offender to answer an indictment, but to answer to a judgment, the conditional release from which he had disregarded, the principle involved was the same.   Smith had been convicted of stealing a slave and sentenced to death.   He was pardoned on condition that he would undergo confinement during a designated period, and within fifteen days afterwards leave the State and never return.   The pardon was accepted, and the prisoner remained in confinement for the time prescribed, and within fifteen days afterwards removed to North Carolina, and remained there some years, when he returned to

South Carolina. The governor of the latter State then issued a proclamation stating that the prisoner was in the State in violation of the condition of his pardon, and offering a reward for his arrest. Smith afterwards returned to North Carolina, where he was forcibly seized by parties from South Carolina, without warrant or authority from any officer or tribunal of either State, except the proclamation of the governor of South Carolina, and was brought into the latter State and lodged in jail. He sued out a writ of *habeas corpus*, and was brought before the Chancellor of the State, and his discharge was moved on the ground that his arrest in North Carolina was illegal, and his detention equally so. The motion was refused and the prisoner remanded. The Chancellor gave great consideration to the case, and in the following extract from his opinion furnishes an answer to the principal objections urged in the case at bar to the detention of the appellant: " The prisoner," said the Chancellor, " is charged with a felonious violation of the laws of this State: it is answered, that other persons have been guilty, in relation to him, of an outrageous violation of the laws of another State, and therefore he ought to be discharged : I perceive no connection between the premises and the inference. The chief argument is drawn from supposed consequences, which are likely to follow, by bringing our government into collision with others. This is less to be apprehended among the States of the Union, where the Federal Constitution makes provision for a satisfaction of the violated jurisdiction. But suppose the case of a foreign State. There is no offence in trying, and, if he be guilty, convicting the subject of a foreign government, who has been guilty of a violation of our laws, within our jurisdiction. Or, if he had made his escape from our jurisdiction, and by any accident were thrown within it again; if he were shipwrecked on our coast, or fraudulently induced to land, by a representation that it was a different territory, with a view to his being given up to prosecution; there would seem to be no reason for exempting him from responsibility to our laws. In the case we are considering, the prisoner is found in our jurisdiction, in consequence of a lawless act of violence exercised upon him by individuals. The true

cause of offence to the foreign government is the lawless violation of its territory  But a similar violation of a foreign jurisdiction might be made for other purposes; and it would not be in the power of our tribunals to afford satisfaction. An individual might be kidnapped and brought within our territory for the purpose of extorting money from him, or murdering him. It would not seem to be an appropriate satisfaction to the injured government to exempt a person justly liable to punishment under our laws, where we have no means of giving up to punishment those who have violated its laws. But there is no difficulty among the States of the Union. Upon demand by the State of North Carolina, those who have violated its laws will be given up to punishment." 1 Bailey (S. C.), 292.

Subsequently the prisoner was brought before the Presiding Judge of the Court of Appeals of the State to answer to a rule to show cause why his original sentence should not be executed and a date fixed for his execution. He showed for cause that he had received an executive pardon, and had performed all the conditions annexed to it, except the one which prohibited his return to the State, which, it was submitted, was illegal and void. And for further cause, he showed, that he had been illegally arrested in North Carolina and brought within the jurisdiction of this State against his own consent, and it was, therefore, insisted that he was not amenable to the courts of South Carolina, but was entitled to be sent back to North Carolina, or to be discharged, and sufficient time allowed him to return thither. The judge held the grounds to be insufficient, and the defendant then moved the court to reverse his decision on substantially the same grounds, and, among them, that he was entitled to be discharged in consequence of having been illegally arrested in North Carolina and brought into the State. Upon this the court said : " The pursuit of the prisoner into North Carolina and his arrest there was certainly a violation of the sovereignty of that State, and was an act which cannot be commended.  But that was not the act of the State, but of a few of its citizens, for which the Constitution of the United States has provided a reparation. It gives the governor of that State the right to

demand them of the governor of this, and imposes on the latter the obligation to surrender them; but until it is refused there can be no cause of complaint." And the motion was refused.

In the case of *The State* v. *Brewster*, 7 Vt. 118, the same doctrine was announced by the Supreme Court of Vermont. There it appeared that the prisoner charged with crime had escaped to Canada, and was brought back against his will, and without the consent of the authorities of that Province, and he sought to plead his illegal capture and forcible return in bar of the indictment; but his application was refused, the court observing that the escape of the prisoner into Canada did not purge the offence, nor oust the jurisdiction of the court, and he being within its jurisdiction it was not for it to inquire by what means or in what manner he was brought within the reach of justice. Said the court: "If there were anything improper in the transaction it was not that the prisoner was entitled to protection on his own account. The illegality, if any, consists in a violation of the sovereignty of an independent nation. If that nation complain it is a matter which concerns the political relations of the two countries, and in that aspect is a subject not within the constitutional powers of this court." pp. 121, 122.

In *State* v. *Ross*, 21 Iowa, 467, the Supreme Court of Iowa declared the same doctrine, and stated the distinction between civil and criminal cases where the party is by fraud or violence brought within the jurisdiction of the court. The defendants were charged with larceny, and were arrested in Missouri and brought by force and against their will, by parties acting without authority, either of a requisition from the governor or otherwise, to Iowa, where an indictment against them had been found. In Iowa they were rearrested, and turned over to the civil authorities for detention and trial. It was contended that their arrest was in violation of law; that they were brought within the jurisdiction of the State by fraud and violence; that comity to a sister State and a just appreciation of the rights of the citizen, and a due regard to the integrity of the law, demanded that the court should under such cir-

cumstances refuse its aid; and that there could be no rightful exercise of jurisdiction over the parties thus arrested. But the court answered that "the liability of the parties arresting them [the defendants] without legal warrant, for false imprisonment or otherwise, and their violation of the penal statutes of Missouri, may be ever so clear, and yet the prisoners not be entitled to their discharge. The offence being committed in Iowa, it was punishable here, and an indictment could have been found without reference to the arrest. There is no fair analogy between civil and criminal cases in this respect. In the one, (civil,) the party invoking the aid of the court is guilty of fraud or violence in bringing the defendant or his property within the jurisdiction of the court. In the other, (criminal,) the people, the State, is guilty of no wrong. The officers of the law take the requisite process, find the prisoners charged within the jurisdiction, and this, too, without force, wrong, fraud, or violence on the part of any agent of the State or officer thereof. And it can make no difference whether the illegal arrest was made in another State or another government."

Other cases might be cited from the state courts holding similar views. There is indeed an entire concurrence of opinion as to the ground upon which a release of the appellant in the present case is asked, namely, that his forcible abduction from another State, and conveyance within the jurisdiction of the court holding him, is no objection to his detention and trial for the offence charged. They all proceed upon the obvious ground that the offender against the law of the State is not relieved from liability because of personal injuries received from private parties, or because of indignities committed against another State. It would indeed be a strange conclusion, if a party charged with a criminal offence could be excused from answering to the government whose laws he had violated because other parties had done violence to him, and also committed an offence against the laws of another State.

The case of *Ker* v. *Illinois*, decided by this court, 119 U. S. 437, has a direct bearing upon the question presented here, whether a forcible and illegal capture in another State is in

violation of any rights secured by the Constitution and laws of the United States. In that case it appeared that Ker was indicted in Cook County, Illinois, for embezzlement and larceny. He fled the country and went to Peru. Proceedings were instituted for his extradition under the treaty between that country and the United States, and application was made by our government for his surrender, and a warrant was issued by the President, directed to one Julian, as messenger, to receive him from the authorities of Peru, upon his surrender, and to bring him to the United States. Julian having the necessary papers went to Peru, but, without presenting them to any officer of the Peruvian Government, or making any demand on that government for the surrender of Ker, forcibly arrested him, placed him on board the United States vessel Essex, then lying in the harbor of Callao, kept him a close prisoner until the arrival of that vessel at Honolulu, in the Hawaiian Islands, where, after some detention, he was conveyed in the same forcible manner on board another vessel, in which he was carried a prisoner to San Francisco, California. Before his arrival in that State the governor of Illinois had made a requisition on the governor of California, under the laws of the United States, for his delivery as a fugitive from justice. The governor of California accordingly made an order for his surrender to a person appointed by the governor of Illinois to receive him and take him to the latter State. On his arrival at San Francisco he was immediately placed in the custody of this agent, who took him to Cook County, where the process of the Criminal Court was served upon him, and he was held to answer the indictment. He then sued out a writ of *habeas corpus* before the Circuit Court of the State, contending that his arrest and deportation from Peru was a violation of the treaty between that government and ours, and that consequently his subsequent detention under the process of the state court was unlawful. The Circuit Court remanded him to jail, holding that whatever illegality might have attended his arrest it could not affect the jurisdiction of the court, or release him from liability to the State whose laws he had violated. He then applied to the Circuit Court of the

United States for a writ of *habeas corpus*, asking his release upon the same ground; but the court refused it, holding that it was not competent to look into the circumstances under which the capture and the transfer of the prisoner from Peru to the United States were made, nor to free him from the consequences of the lawful process which had been served upon him for the offence which he was charged with having committed in the State of Illinois. When arraigned on the indictment in the trial court he raised similar questions on a plea in abatement, which was held bad on demurrer; and after conviction he carried the case on a writ of error to the Supreme Court of the State, where the same conclusion was reached, and the judgment against him was affirmed. He then brought the case to this court, where it was contended that under the treaty of extradition with Peru, he had acquired by his residence in that country a right of asylum — a right to be free from molestation for the crime committed in Illinois — a right that he should be forcibly removed from Peru to the State of Illinois only in accordance with the provisions of the treaty; and that this right was one which he could assert in the courts of the United States. But the court answered that there was no language in the treaty on the subject of extradition which said in terms that a party fleeing from the United States to escape punishment for a crime became thereby entitled to an asylum in the country to which he had fled; that it could not be doubted that the government of Peru might, of its own accord, without any demand from the United States, have surrendered Ker to an agent of Illinois, and that such surrender would have been valid within Peru; that it could not, therefore, be claimed, either by the terms of the treaty or by implication, that there was given to a fugitive from justice in one of those countries any right to remain and reside in the other; and that if the right of asylum meant anything it meant that.

So in this case, it is contended that, because under the Constitution and laws of the United States a fugitive from justice from one State to another can be surrendered to the State where the crime was committed, upon proper proceedings

taken, he has the right of asylum in the State to which he has fled, unless removed in conformity with such proceedings, and that this right can be enforced in the courts of the United States. But the plain answer to this contention is, that the laws of the United States do not recognize any such right of asylum, as is here claimed, on the part of a fugitive from justice in any State to which he has fled; nor have they, as already stated, made any provision for the return of parties who, by violence and without lawful authority, have been abducted from a State. There is, therefore, no authority in the courts of the United States to act upon any such alleged right. In *Ker* v. *Illinois*, the court said that the question of how far the forcible seizure of the defendant in another country, and his conveyance by violence, force, or fraud to this country could be made available to resist trial in the state court for the offence charged upon him, was one which it did not feel called upon to decide, for in that transaction it did not see that the Constitution, or laws, or treaties of the United States guaranteed to him any protection. So in this case we say that, whatever effect may be given by the state court to the illegal mode in which the defendant was brought from another State, no right, secured under the Constitution or laws of the United States, was violated by his arrest in Kentucky, and imprisonment there, upon the indictments found against him for murder in that State.

It follows that

*The judgment of the court below must be affirmed.*

MR. JUSTICE BRADLEY, with whom concurred MR. JUSTICE HARLAN, dissenting.

I dissent from the judgment of the court in this case. In my opinion the writ of *habeas corpus* was properly issued, and the prisoner, Mahon, should have been discharged and permitted to return to West Virginia. He was kidnapped and carried into Kentucky in plain violation of the Constitution of the United States, and is detained there in continued violation thereof. It is true, he is charged with having com-

mitted a crime in Kentucky. But the Constitution provides a peaceable remedy for procuring the surrender of persons charged with crime and fleeing into another State. This provision of the Constitution has two objects: the procuring possession of the offender, and the prevention of irritation between the States, which might arise from giving asylum to each other's criminals, and from violently invading each other's territory to capture them. It clearly implies that there shall be no resort to force for this purpose. The Constitution has abrogated, and the States have surrendered, all right to obtain redress from each other by force. The Constitution was made to "establish justice" and "insure domestic tranquillity;" and to attain this end as between the States themselves, the judicial power was extended "to controversies between two or more States," and they were enjoined to deliver up to each other fugitives from justice when demanded, and even fugitives from service. This manifest care to provide peaceable means of redress between them is utterly irreconcilable with any right to redress themselves by force and violence; and, of course, what is unconstitutional for the States is unconstitutional for their citizens. It is undoubtedly true that occasional instances of unlawful abduction of a criminal from one State to another for trial, have been winked at; and it has been held to be no defence for the prisoner on his trial. Such precedents are founded on those which have arisen where a criminal has been seized in one country and forcibly taken to another for trial, in the absence of any international treaty of extradition. It is obvious that such cases stand on a very different ground. It is there a question between independent nations bound by no ties of mutual obligation on the subject, and at liberty to adopt such means of redress and retaliation as they please. But where an extradition treaty does exist, and a criminal has been delivered up under it, he cannot, without violating the treaty, be tried for any other crime but that for which he was delivered up. *United States* v. *Rauscher*, 119 U. S. 407. This shows that, even when rightfully obtained for one offence, he cannot be prosecuted for another. It is true that in the same volume is found the case of *Ker* v. *Illi-*

*nois,* 119 U. S. 437, in which it was held not to be a good plea to an indictment, that the prisoner was kidnapped from Peru, with which country we had an extradition treaty. But this was because, as before said, the prisoner himself cannot set up the mode of his capture by way of defence, if the State from which he was abducted makes no complaint. Peru made none.

But this is not such a case. The State from which Mahon was abducted has interposed, not only by a formal demand for his restoration, but by suing out a *habeas corpus.* Perhaps the writ might have been sued out of this court, as the controversy had come to be a controversy between the States, Kentucky having availed herself of the fruits of the unlawful abduction by retaining the victim, and refusing to restore him on demand. The State of West Virginia, however, has elected, as she might do, to have the writ directed only to the person holding Mahon in custody. I take this to be a legal and apt remedy to settle the case by peaceable judicial means.

A requisition would not apply. That is provided for the extradition of fugitives from justice. It would apply for the delivery up of the kidnappers, but not for the restoration of their victim. It is a special constitutional remedy, addressed by the executive of one State to the executive of another, imposing a constitutional duty of extradition when properly made in a proper case. But the present case is a different one. It is not the surrender of a fugitive from justice which is sought, but the surrender of a citizen unconstitutionally abducted and held in custody. There must be some remedy for such a wrong. It cannot be that the States, in surrendering their right of obtaining redress by military force and reprisals, have no remedy whatever. It was suggested by counsel that the State of West Virginia might sue the State of Kentucky for damages. This suggestion could not have been seriously made. No; the remedy adopted was the proper one. *Habeas corpus* is not only the proper legal remedy, but a most salutary one. It is calculated to allay strife and irritation between the States by securing a judicial and peaceful decision of the controversy.

But it is contended that, although it may be within the

spirit of the Constitution, it is not within its letter, and special legislation is necessary to enable the courts or judges to issue a *habeas corpus*. I do not think that the conclusion follows. Congress, from the beginning, clothed the courts and judges of the United States with the general power to issue writs of *habeas corpus;* with the restriction, at first, not to extend to prisoners in jail, unless in custody under authority of the United States, etc. But in 1833, 1842, and 1867 this restriction was modified, and by the last act removed altogether " in all cases where any person may be restrained of his or her liberty, in violation of the Constitution, or of any treaty or law of the United States." 14 Stat. 385. Rev. Stat. § 753. And see *Ex parte Parks,* 93 U. S. 18, 22, where the reference to 14 Stat. should be p. 385 instead of p. 44. This is legislation enough. A citizen of West Virginia is deprived of his liberty contrary to the Constitution and laws of the United States. The exigency has arisen in which the law applies; and if the party himself is precluded from setting up his wrongful abduction as a defence to an indictment, and perhaps precluded from demanding his discharge on *habeas corpus*, his State has intervened for his protection, and has sued out the writ. But I think that his own application for the writ is well grounded. He is not in the situation of a criminal who has been abducted from a State which takes no interest in his case. His restoration has been demanded by his State; and *habeas corpus* may be issued either at his own instance or that of the State.

This court does not hesitate, on the plea of insufficient legislation, to issue the writ of *habeas corpus* as an appellate remedy wherever a citizen is deprived of his liberty in violation of the Constitution or laws of the United States, and is refused a discharge by other tribunals, and has no other remedy. See *Ex parte Royall,* 112 U. S. 181; *Ex parte Royall,* 117 U. S. 241.

I think that the judgment of the Circuit Court should be reversed, and the prisoner restored to his liberty with permission to return to the State of West Virginia. I am authorized to say that Mr. Justice HARLAN concurs in this opinion.