**UNITED STATES of America,**
**Plaintiff,**

v.

**Rawney TRUNKO, Defendant.**

**No. LR–60–CR–122.**

United States District Court
E. D. Arkansas, W. D.

Dec. 9, 1960.

Osro Cobb, U. S. Atty., James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

G. Thomas Eisele, Little Rock, Ark., Henry C. Lavine, Cleveland, Ohio, for defendant.

HENLEY, Chief Judge.

This criminal case has been tried to the Court without a jury. The indictment in a single count charges a violation of 18 U.S.C.A. § 242,[1] one of the federal "civil rights" statutes. The indictment alleges in substance that on or about March 28, 1959, within the Western Division of the Eastern District of Arkansas, and within the jurisdiction of this Court, the defendant, Rawney Trunko, a deputy sheriff of Summit County, Ohio, acting under color of the laws, statutes, ordinances, and regulations of the State of Ohio and Summit County, did willfully subject Watt Ralph Williams, an inhabitant of the State of Arkansas, to the deprivation of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States, to-wit: the right not to be deprived of his liberty without due process of law, and the right not to be removed against his will from the State of Arkansas to the State of Ohio by persons acting under color of the laws of the State of Ohio or of the State of Arkansas for an offense alleged to have been committed in the State of Ohio, except upon a warrant or process lawfully issued for his extradition and removal to the State of Ohio.

More specifically, it is charged that the defendant, without having obtained any warrant or process authorizing the removal or extradition of Williams from Arkansas to Ohio, willfully seized Williams and took him into custody in the Town of Pangburn, White County, Arkansas, and, against Williams's will, transported and removed him to Ravenna, Ohio, for the purpose of having the said Williams stand trial in a court in Ohio for the alleged commission of an offense, with the intent to deprive Williams of his aforesaid constitutional rights, privileges, and immunities.

The background facts of the case established by undisputed evidence or by stipulation of counsel may be summarized as follows:

The complaining witness, Watt Ralph Williams, an inhabitant of Arkansas, is by trade a pipe line worker, who during the fall of 1958 was employed near Ravenna in Portage County, Ohio. On October 25, 1958, Williams was arrested by local officers in Ravenna and charged with operating a motor vehicle while under the influence of intoxicating liquor, a misdemeanor. Bond was fixed in the sum of $500.

Williams and his wife applied to The Summit Fidelity and Surety Company of Akron, Ohio, a commercial bonding company, to become the surety on his bail bond. The application was accepted, and the bonding company, upon receipt of a $50 fee paid by Williams or his wife, executed Williams's bond as surety. The obligation of the bond was that Williams should appear before the municipal court at Ravenna at 9:00 A.M. on October 27, 1958, to answer the charge against him and to abide the judgment of the court.

Williams, to use a coloquial expression, "jumped his bond," and when he did not appear in the municipal court on October 27, the bond was forfeited, and a bench warrant was issued for his arrest. Williams left Ohio and went to Louisiana where he worked for a time. Upon being laid off by his employer, he went to the vicinity of Pangburn, Arkansas, and remained there until the date of the alleged offense, making his home with his elderly father.

The bonding company was not willing to accept its loss and determined to seek out Williams and return him to Ohio to answer the charge against him so that the forfeiture of the bond might be remitted. The task of locating Williams and bringing him back to Ohio was assigned to the defendant, Rawney Trunko,

1. "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States * * * shall be fined not more than $1,000 or imprisoned not more than one year, or both."

a "special investigator" for the company.[2] At all times here pertinent Trunko held a commission as a special deputy sheriff of Summit County, Ohio. As such deputy he received no compensation from the county or from the State of Ohio, and the sheriff seems not to have been responsible for any of his acts; but his status did, as far as Ohio law is concerned, permit him to carry a gun, and he also carried a badge identifying him as a special deputy sheriff of Summit County.

After some investigation in Ohio and in Louisiana, Trunko discovered that Williams was residing with his father near Pangburn. This discovery was made some days prior to the alleged commission of the offense charged in the indictment and at a time when the bonding company desired to recapture another fugitive who was supposed to be in Phoenix, Arizona. It was decided that Trunko, accompanied by one Pratt, would undertake the apprehension and return of both Williams and the other fugitive in the course of a single trip.

Trunko and Pratt left Ohio and went first to Phoenix where they were unable to locate the individual whom they sought at that place. They thereupon commenced the return trip intending to call at Pangburn and apprehend Williams. Trunko was armed, was carrying his badge, and had in his possession a copy of the bench warrant which had been issued for Williams's arrest after he did not appear in the municipal court in Ohio.

Apparently, Trunko and Pratt drove non-stop from Phoenix to the vicinity of Pangburn, where they arrived before daylight on the morning of March 28, 1959. After making some inquiry, they located and proceeded to the home of the elder Williams. They left their car, approached the house, and Trunko knocked on the door which was opened by Watt Williams's father who at the time was 80 or 81 years old.

The Court does not deem it necessary to abstract the evidence, somewhat conflicting, as to just what occurred at the Williams home after the door had been opened to Trunko's knock. Suffice it to say that the Court finds from the evidence beyond a reasonable doubt that Trunko and Pratt entered the house; that Trunko inquired as to the whereabouts of Watt Williams after showing his badge to the latter's father; that Trunko upon being informed that Watt Williams, his wife, and infant child were asleep in an adjoining room, entered that room without knocking; and that he shone a flashlight on Watt Williams and directed him to get up and dress. When Williams and his wife requested an explanation of Trunko's presence, the latter displayed his badge as a special deputy sheriff and also exhibited the Ohio bench warrant, and permitted Williams, his wife, and possibly his father to see the pistol that Trunko was carrying. There was no evidence that Trunko ever actually drew the gun at any time.

The Court further finds from the evidence beyond a reasonable doubt that Mrs. Williams was considerably excited about her husband's arrest and desired to communicate with the Sheriff of White County. She also expressed a desire to accompany her husband and, when Trunko refused to take her along, she expressed an intention of following his car.

After Williams had dressed he accompanied Trunko and Pratt to the car which he entered. He was thereupon handcuffed, and the car was driven away by Trunko at a high rate of speed. Mrs.

---

**2.** The record shows that two bonding companies appear to have been involved in the case, namely, The Summit Fidelity and Surety Company, which has been mentioned, and the P. & C. Bonding Company. The defendant was actually an employee of P. & C. Bonding Company, and the relationship of that company to the Summit company is not clear. However, the Court deems that matter to be immaterial in the light of the evidence and of the theories of the respective parties, and both companies will be considered as included in the general term "the bonding company" or "the company."

Williams undertook to follow, but was soon outdistanced.

While both Watt Williams and his wife testified that nothing was said by Trunko about taking Williams back to Ohio, and that, on the other hand, Trunko represented that Williams was to be taken to Little Rock for a short questioning about a purportedly stolen car, the Court is convinced that Williams, at least, knew that he was being apprehended on account of the Ohio offense that has been mentioned, and that he was to be taken to Ohio. However, the Court finds from the evidence beyond a reasonable doubt that Williams was not advised that Trunko was acting as an employee of the bonding company, and that Williams believed that he was being arrested by a peace officer acting in his official capacity and on the authority of a bench warrant issued by an Ohio court.

It had been the original plan of Trunko and Pratt to lodge Williams in jail temporarily in Little Rock while they rested from their long drive from Phoenix, Arizona, to Arkansas, and then to resume their trip. Mrs. Williams's protests about her husband's apprehension, however, and her expressed intentions to communicate with the sheriff and to follow her husband, caused Trunko to abandon the original plan and to drive on to Ohio without stopping except for meals.

When the party reached Ohio, Williams was permitted to communicate briefly with his wife by long distance telephone. He was subsequently lodged in jail. On March 30, 1959, Williams was brought before the Municipal Court in Ravenna, Ohio. He entered a plea of guilty to the original charge against him, and was fined $250 with the proviso that $100 of the fine would be suspended "on condition defendant within 5 days make satisfactory reimbursement to Bondsman for costs of bringing before Court."

Some days later the fine and expenses of the bonding company, the latter item amounting to $312.80, were paid, and Williams was released from custody. This prosecution of Trunko followed in due course.

The burden is upon the Government in this case to establish all of the essential elements of the offense charged by the evidence beyond a reasonable doubt. That is to say, the Government must prove beyond a reasonable doubt that the actions taken by defendant with respect to Williams were taken "under color of law," that such actions deprived Williams of one or more rights secured or protected by the Constitution or laws of the United States, and that such deprivation, if any, was "willful" as that term is used in the statute. See United States v. Jackson, 8 Cir., 235 F.2d 925.

In the Court's estimation the Government has sufficiently established the first two elements above mentioned, but has failed to establish the third by the requisite degree of proof.

## I.

While defendant contends earnestly that he was acting purely as an agent of the bonding company and never acted or purported to act as an officer of the law, that he showed Williams the badge and warrant merely for purposes of identification and to explain the purpose for which Williams was wanted and to justify the possession of the pistol, and that Williams understood the situation thoroughly and knew in what capacity defendant was acting, the Court is persuaded that defendant represented himself as an Ohio peace officer serving an Ohio warrant, and that Williams accepted that representation and submitted to arrest on the strength thereof. Defendant's obvious thought in purporting to act as an officer was that Williams, accosted in his father's house in the small hours of the morning, would be more likely to submit to a peace officer holding a warrant for his arrest than to a private citizen representing a distant bonding company.

Since defendant purported to act as an Ohio officer armed with an Ohio warrant, his actions were "under color of law" within the meaning of Section 242, even though it be conceded that he had no actual authority as an officer to arrest Williams in Arkansas and carry him to Ohio.

Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774; Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368.

In Classic, supra, it was said (at page 326 of 313 U.S. at page 1043 of 61 S.Ct.):

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."

And in Screws, supra, at page 111 of 325 U.S., at page 1040 of 65 S.Ct. the Court said that an act is done under color of law when it is done "under pretense of law," and that while acts of officers in the ambit of their personal pursuits are not done "under color of law" and are excluded from the statute, nevertheless, acts of officers are included if the officers "undertake to perform their official duties * *: * whether they hew to the line of their authority or overstep it."

Nor is it material that defendant was merely a "special deputy sheriff" who received no official compensation and for whose acts the sheriff was not responsible under Ohio law. A somewhat similar situation was presented in Williams v. United States, supra, wherein it was held that a private detective holding a special policeman's card issued by the City of Miami, Florida, was acting under color of law when he apprehended certain individuals accused of theft and undertook to extort confessions from them by the employment of physical duress. Conceding that defendant's position as a special deputy sheriff was somewhat anomalous, the Court is convinced that he had some official status as an Ohio officer, and was clothed with at least some State authority which he proceeded to employ in carrying out his mission.

## II.

Passing to the question of whether Williams was deprived of a federally protected right, the Government concedes that the surety on a bail bond has the right to pursue and recapture a defaulting principal wherever the latter may be found and to return him to the State where prosecution is pending without extradition or other legal process. Taylor v. Tainter, 16 Wall. 366, 83 U.S. 366, 21 L.Ed. 287; Fitzpatrick v. Williams, 5 Cir., 46 F.2d 40, 73 A.L.R. 1365; Ex parte Salinger, 2 Cir., 288 F. 752.

As stated, however, the Court has found that defendant in apprehending Williams did not purport to act as agent for the bonding company, but as an Ohio officer executing an Ohio warrant. In that capacity he had no right to seize Williams in Arkansas and remove him to Ohio. 4 Am.Jur. Arrest, § 19; Fitzpatrick v. Williams, supra; cf. Mahon v. Justice, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283; and McLean v. State of Mississippi, 5 Cir., 96 F.2d 741, 119 A.L.R. 670.

In such circumstances, the question arises as to whether the wrongful act of defendant under color of law in effecting the removal of Williams to Ohio violated any right of Williams secured or protected by the Constitution or laws of the United States.

In its presentation of the case and in its brief the Government appears to have assumed that, apart from the right of a surety on a bail bond to recapture and return the principal without extradition, a person accused of crime in State A who flees to State B has a federally protected right not to be seized in the latter State and removed to the former without extradition in conformity with Article 4, § 2, cl. 2 of the constitution of the United States, as implemented by what is now 18 U.S.C.A. § 3182.

While some support for that view may be found in general language employed in cases like United States ex rel. McCline v. Meyerling, 7 Cir., 75 F.2d 716, and Fitzpatrick v. Williams, supra, the Court is not fully convinced that either the Constitutional provision or federal statute above mentioned, or the due process clause of the 14th Amendment, protects a fugitive criminal from unlawful removal from the asylum State to the State

where the prosecution is pending. It must be remembered that Article 4, § 2, cl. 2 of the Constitution and Section 3182 of Title 18 were not adopted for the protection of fugitives from justice but to aid the State wherein a crime is committed to obtain custody of an accused who has fled to another State. Moreover, it is well settled that an unlawful removal of a prisoner from State B to State A to stand trial in the latter State is not a denial of due process such as will oust the courts of State A of jurisdiction. In this connection in Sweet v. Howard, 7 Cir., 155 F.2d 715, 717, the Court said:

"* * * It is not a denial of due process of law to return one from another state, even by force and without the formality of extradition procedure, to face criminal charges in the state to which he is returned. If the party is before the court, the court will not inquire how he got there. This is elementary. 25 American Jurisprudence, § 34, p. 169. One may be forcibly taken from one state to another and placed in the custody of a court in which proceedings are pending against such person without violating the Constitution of the United States or depriving the court in the holding state of its jurisdiction. Mahon v. Justice, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283."

However, the Court finds it unnecessary to decide whether Williams had a "right to extradition" protected by the Federal Constitution or laws, because the indictment charges that Williams's right "not to be deprived of his liberty without due process of law" as well as his alleged "right to extradition" was violated by the defendant. And the Court is persuaded that, regardless of whether the arrest and removal of Williams violated a federal right merely because the arrest was not preceded or followed by the initiation of extradition proceedings in Arkansas, the actions of defendant in arresting Williams, in taking him from his father's house, in handcuffing him in defendant's car, and in transporting him to Ohio, all of which was done under color of law and State authority, and all of which was wrongful and illegal, amounted to a violation of Williams's right not to be deprived of his liberty without due process of law, a right clearly protected by the 14th Amendment. Cf. Crews v. United States, 5 Cir., 160 F.2d 746.

### III.

It is not enough, however, for the Government to prove that the defendant while acting under color of law in fact deprived Williams of some right, privilege, or immunity protected by the Federal Constitution or laws. It must go further and prove that such deprivation was "willful" within the statutory meaning of that term.

It has been held that "willful" is a word of many meanings; it may mean one thing in one context and something else in another. Spies v. United States, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418. Its meaning in what is now Section 242 was exhaustively considered by the Supreme Court in Screws v. United States, supra, and it was there held that "willful," as used in the statute, means more than volitional and more than an act done with a general evil purpose. In order to constitute a "willful" deprivation of civil rights there must be present in the mind of the actor the specific evil intent to deprive the victim of rights protected or secured by the Constitution or laws of the United States. See also Williams v. United States, supra.

While Trunko undoubtedly intended to arrest Williams and transport him from Arkansas to Ohio, and while he undoubtedly intended to procure the submission of Williams by acting in his official capacity rather than as a mere private person, this Court is not convinced beyond a reasonable doubt that Trunko's actions, however wrongful they may have been in themselves, were accompanied by any specific intent to deprive Williams of any right secured to him by the Constitution or laws of the United States.

In this connection Trunko testified that he did not believe that a "bond jumper"

had any civil rights against recapture and return to the State wherein criminal charges against him were pending. And, as stated, it is quite true that Williams had no such right as against his bondsman. There was nothing evil in the ultimate purpose which defendant sought to achieve, and he could have achieved it with perfect propriety had he simply represented himself in his capacity as agent of the bonding company. While defendant chose to act as a peace officer, the Court believes that in so doing he probably was prompted by considerations of his own convenience rather than by any intent to deprive Williams of any legal right. At least, the Court is not convinced to the contrary beyond a reasonable doubt.

Although, for the reason just stated, the Court is compelled to acquit the defendant, such action is not to be taken as any indication of approval of his conduct. Trunko could easily have waited until daylight to approach the Williams home. He could have contacted the Sheriff of White County and made his mission known and obtained assistance or support if he felt such to be necessary. Instead of following such an open and above board course, Trunko elected to make his arrest in the hours of darkness. When the door was opened to his knock, he burst his way into the presence of a law-abiding peaceable old man. He rudely entered a bedroom occupied by a man, his wife, and baby, flashing a light in the eyes of the sleeping object of his search. He purported to be an officer of the law and placed Williams under arrest, thereafter hastening him from the house, placing him in an automobile, and handcuffing him as though he were a dangerous criminal. After so doing, the defendant and Pratt drove away with Williams at a terrific rate of speed, ignoring the pleas and protests of their prisoner's wife. All of this was done to secure a remission of a $500 misdemeanor bond. In the Court's estimation Trunko's conduct is properly characterized as highhanded, unreasonable, and oppressive. Further, defendant's actions constituted an affront to the duly constituted authorities of White County and of the State of Arkansas, and were of a nature tending to bring law enforcement into disrepute.

But the Court is not here concerned with whether Trunko violated the laws of Arkansas or of Ohio, or with whether he committed an actionable tort. Defendant is entitled to be judged with respect to whether he violated the particular federal statute under which he is charged and, as stated, the Court is not convinced beyond a reasonable doubt of the existence of all of the essential elements necessary to constitute a violation of said statute.

Let a judgment of acquittal be entered.