**Refugio Gardea GONZALEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 3–86–248–CR.**

Court of Appeals of Texas,
Austin.

Aug. 12, 1987.

Kenneth D. DeHart, Alpine, for appellant.

Phil J. Pollan, Dist. Atty., Fort Stockton, for appellee.

Before POWERS, GAMMAGE and CARROLL, JJ.

POWERS, Justice.

Refugio Gardea Gonzalez appeals from a trial-court judgment wherein he is convicted of aggravated sexual assault. Tex.Pen. Code Ann. § 22.021 (Supp.1987). The jury found him guilty over his plea of not guilty and the trial judge assessed punishment at 75 years imprisonment and a $10,000 fine. We will affirm the judgment.

### PLEA TO THE JURISDICTION

Gonzalez, a Mexican national, contends the trial court erred in overruling his plea that the court lacked or should decline jurisdiction over his person. In his plea, Gonzalez alleged that on January 22, 1986, he was forcibly and involuntarily taken from a jail in Ojinaga, Chihuahua, in the United Mexican States, and brought to Brewster County, Texas, where he was taken into custody by the sheriff of that county and made to stand trial for the offense alleged in the indictment. Gonzalez argued in consequence that his custody and presence

before the court were obtained in violation of: (1) his right under the Constitution of the United States to be free of unreasonable seizure and deprivation of liberty without due process of law; and, (2) the provisions, upon which he was entitled to rely, contained in the extradition treaty between the United States and the United Mexican States, insofar as they govern the extradition from Mexico of Mexican nationals charged with an offense in the United States.[1]

The indictment in the present case was returned before Gonzalez' alleged abduction from Mexico and charges that he committed the aggravated sexual assault in Brewster County on or about October 26, 1985. He was arrested in that county under a warrant issued by the district court of the county. He was tried for the offense in Tom Green County after his motion for change of venue was sustained in Brewster County.

The plea to the jurisdiction was determined by the trial court after an evidentiary hearing wherein Gonzalez and the sheriff of Brewster County testified, the latter being called by Gonzalez. Gonzalez testified substantially as follows: In the early morning hours of January 22, 1986, two individuals broke into his cell in the Ojinaga jail. He did not know them but one was a "gringo" and the other a "chicano." Both were dressed "like soldiers" although they wore no badge or insignia, and both were armed with automatic weapons that Gonzalez identified as "AR–15s." The "gringo" ordered Gonzalez from his cell while the "chicano" forced the sole jail official to lie on the floor. The two abductors took Gonzalez into the United States and after some time he was taken to a roadside park south of Alpine, Brewster County, Texas. He was blindfolded, bound with baling wire, and clothed only in the underwear he was wearing when abducted from his cell. Later, he heard an automobile arrive at the park and heard as well conversations that he could not understand between the "gringo" and another man. He later identified the sheriff as the other

man. The sheriff placed him in the sheriff's automobile and asked if he "was a man who molested a woman." Gonzalez remained blindfolded and was driven by the sheriff to the jail in Alpine.

The sheriff testified substantially as follows: On the night he found Gonzalez, he received an anonymous telephone call. The caller stated: "Sheriff, there is a ... naked man running around in the roadside park south of town." Although he thought the call was probably a college-student prank, the sheriff drove to the park where he arrived about fifteen minutes later. Looking around the park with the aid of the headlights on his automobile, he found a man, whom he did not recognize, wearing only underwear, bound with baling wire, and blindfolded. He asked the man what he was doing in the park and he replied: "Mafioso, Mafioso." (Gonzalez testified that he did not remember making this remark.) The man made other remarks in rapid Spanish that the sheriff could not understand. He placed the man in his automobile and drove to the Alpine jail, leaving him bound. At the jail, the sheriff got an inmate to translate for the man but about the same time, apparently, the sheriff noticed on the man's body certain tattoos that matched those attributed to "Refugio Gardea Gonzalez," who had been indicted for aggravated sexual assault and for whom the sheriff held an arrest warrant. The sheriff arrested the man under authority of the warrant, believing him to be Gonzalez. The sheriff testified that he and Gonzalez were alone at the roadside park, implying therefore that he talked to no one else at the park.

█ The trial court overruled Gonzalez' plea to the jurisdiction after hearing the evidence and the argument of counsel. In his appeal from that order, Gonzalez advances several legal arguments for his claim that the order was erroneous. All of them are founded upon the proposition that he was taken illegally and against his will *from Mexican soil*, then delivered into the custody of the sheriff in Brewster County, Texas. The argument rests also upon the

1. Extradition Treaty, May 4, 1978, United States- Mexico, 31 U.S.T. 5059, T.I.A.S. No. 9656.

unspoken assumption that the trial court was *required to believe* that part of Gonzalez' uncontradicted testimony wherein he testified to that effect. We believe, however, that the trial court could reasonably have declined to believe this part of Gonzalez' testimony. While Gonzalez' credibility was seriously undermined at the trial on the merits by his own contradictory statements made at that stage of the proceedings and by certain physical evidence adduced there, we shall limit our consideration of the point to the testimony given in the pre-trial hearing on Gonzalez' plea to the jurisdiction.

The record reveals that Gonzalez does not fully understand English and his testimony at the pre-trial hearing was given (as it was at the trial on the merits) through a court-appointed interpreter. Some of his testimony at the pre-trial hearing is contradictory. We refer, for example, to his testimony that no other person was present when "they" placed him in the sheriff's automobile at the park. Contradictions of this nature may be explained on the basis of faulty translation or understanding, although Gonzalez does not suggest as much. On the other hand, we do not believe this explanation can reach the rather clear and direct conflict between the sheriff's testimony that no other person was present at the park and Gonzalez' testimony to the contrary. Gonzalez being both interested in the outcome of the proceeding and one whose testimony had been contradicted in one important aspect, we believe the trial court was free to reject all or any part of his testimony, even a part that was not contradicted. *Miller v. State*, 388 S.W.2d 186 (Tex.Cr.App.1965).

We hesitate to rest our decision solely upon the ground stated in the preceding paragraph. The record reveals that Gonzalez moved the trial court to allow him to take the depositions of certain Ojinaga residents in order to establish the facts relating to his alleged abduction from the jail in that city. The trial court overruled his motion, apparently because the motion on its face showed that the Ojinaga residents were beyond the subpoena power of the trial court. We shall, in the interest of justice, accept as true the factual foundation necessary to Gonzalez' legal contention that the trial court had no jurisdiction over his person. That is to say, in the discussion that follows we shall accept as true his testimony that he was illegally and involuntarily taken from Mexican soil by persons whom he did not know and then delivered into the custody of the sheriff in Brewster County, Texas.

Gonzalez argues that the trial court could not acquire jurisdiction over his person because his abduction from Mexico and subsequent delivery into the sheriff's custody in Brewster County were in contravention of rights guaranteed him in the federal Constitution and in the extradition treaty between the United States and the United Mexican States. Concerning the former, he intends the Constitutional guarantees against unreasonable seizures and deprivations of liberty without due process of law; concerning the latter, he intends those portions of the treaty establishing the procedures, documentation, and official acts necessary to effectuate the extradition of a Mexican national to the United States for an offense committed in the United States.[2]

**2.** The Fourth Amendment to the Constitution of the United States provides that "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated." The Fifth Amendment declares that "[n]o person shall be ... deprived of ... liberty, without due process of law." The Fourteenth Amendment forbids a State to "deprive any person of ... liberty ... without due process of law; ..."

In the extradition treaty, the United States and the United Mexican States agreed to certain terms concerning the extradition of persons charged, found guilty, or wanted by either of the two nations with respect to offenses designated in the treaty. Among those terms are the following: (1) extradition may be granted only if the evidence is sufficient, according to the laws of the nation harboring the fugitive, to justify committal for trial or to prove that the individual is the person convicted in the requesting nation (art. 3); (2) the nationals of either party need not be extradited except that the executive authority of his nation determines, in its discretion, that it is "proper" and extradition is not prevented by that nation's laws, but if

In *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), the Supreme Court of the United States ruled that neither the federal Constitution nor the terms of an extradition treaty between Peru and the United States impaired the jurisdiction of an Illinois trial court over a defendant who had been kidnapped from Peru and delivered into official custody in Illinois, without reference to such treaty, to stand trial for an offense alleged to have been committed in that State.[3] The illegal and involuntary removal of the defendant from Peru was held not to invoke either the federal Constitution or the treaty. Instead, the legal consequences of such actions would depend upon what effect the courts of Illinois chose to give such actions under the common law of that State or the law of nations. 119 U.S. at 445, 7 S.Ct. at 230.

■ Referring to the law of Texas, we find that Gonzalez' illegal abduction and forced return to Texas, where he was arrested under a warrant held by the sheriff, would not deprive the trial court of jurisdiction over his person, in the absence of a showing that public officials in the United States arranged or acted in his abduction and return to Texas. *Benavidez v. State,* 143 Tex.Cr.R. 481, 154 S.W.2d 260 (1941),

cert. denied, 315 U.S. 811, 62 S.Ct. 794, 86 L.Ed. 1210 (1942); *Ex parte Ponzi,* 106 Tex.Cr.R. 58, 290 S.W. 170 (1927); *Dominguez v. State,* 90 Tex.Cr.R. 92, 234 S.W. 79 (1921). No evidence was adduced in the present case that tended to establish such official misconduct.

Gonzalez concedes in the end the controlling effect of *Ker* and the decisions mentioned in the preceding paragraph. He contends, however, that the rule of these cases should be changed in order to deter invasions of foreign-state sovereignty by private persons ("bounty hunters"). We observe, however, that the extradition treaty contains its own remedy in this respect. Abduction and false imprisonment are extraditable offenses under the treaty when committed by a person found in the United States, whether of Mexican or United States nationality. Gonzalez also argues that the rule should be changed because it is out of fashion, judicially speaking, as measured against a modern judicial policy and trend toward depriving the prosecution of benefits delivered to it by other persons who have acted illegally. *See United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974).[4] We do not see that the considera-

---

the national is not extradited his case shall be submitted to competent authorities for prosecution in the harboring nation (art. 9); (3) requests for extradition shall be "handled" through the diplomatic "channel," describe the offense and be accompanied by a statement of the facts of the case and other information, including a certified copy of the arrest warrant and a statement of the evidence justifying apprehension under the laws of the requesting nation (art. 10); and, (4) the request for extradition shall be determined in accordance with the legislation of the nation to whom the request is made (art. 13).

**3.** An analogous rule applies with respect to defendants taken illegally from one state of the union to another, there to answer for a crime previously committed. *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Mahon v. Justice,* 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283 (1888). The "general rule" in either case is said to be as follows:

... where a person accused of a crime is found within the territorial jurisdiction wherein he is [charged with a crime], and is held under process legally issued from a court of that jurisdiction, neither the jurisdiction of the court nor the right to put him on trial for

the offense charged is impaired by the manner in which he was brought into the jurisdiction, whether by kidnapping, illegal arrest, abduction, fraud, or the like.

Annot., 25 A.L.R.4th 159, 160 (1983); *see also,* 1 Torcia, Wharton's Criminal Procedure § 15, at 50–53 (1974 & Supp.1986) and cases there cited. The present case is to be distinguished from those where the defendant is returned to the forum state under or pursuant to formal extradition proceedings, whether perfectly or imperfectly conducted. *See e.g., United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886); *Gaither v. State,* 479 S.W.2d 50 (Tex.Cr. App.1972).

**4.** The theory is along the line of the evidence-exclusion rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and involves the considerations therein set forth upon which the Supreme Court closed "the only courtroom door [State prosecutions] open to evidence secured by official lawlessness in flagrant abuse of [the constitutional right of privacy], reserved to all persons as a specific guarantee against that very same unlawful conduct." 367 U.S. at 655, 81 S.Ct. at 1691. *Toscanino* holds that a court should divest itself of jurisdiction over the defendant's person when it is acquired through

**324**

tions behind that policy and trend are present in cases like the one before us. In any case, however, we are not free to depart from the rules laid down in *Ker, Benavidez, Ponzi,* and *Dominguez,* as well as a large number of other decisions to the same effect.

We therefore hold the trial court did not err in overruling Gonzalez' plea to the jurisdiction.

### MOTION FOR MISTRIAL

In the guilt-innocence stage of the trial, the prosecution elicited from the victim certain testimony concerning how the sexual assault had affected her life. This testimony was given after the trial court overruled defense counsel's objection to the question posed. After the testimony was given, however, the trial court sustained defense counsel's second objection as well as his motion that the jury be instructed to disregard the testimony. The instruction was duly given. Defense counsel then moved for a mistrial which the trial court denied and from which Gonzalez appeals.

■ We conclude, in light of the testimony given and the whole record, that the trial court's instruction to disregard the testimony in question cured the prejudicial effect of any error and that the trial court, therefore, properly denied defense counsel's motion for mistrial. *Kelley v. State,* 677 S.W.2d 34 (Tex.Cr.App.1984).

We therefore overrule Gonzalez' point of error complaining of the trial court's overruling his motion for mistrial.

Finding no error, we affirm the judgment of the trial court.

**K.L.M., Appellant,**

v.

flagrant, deliberate, and illegal acts *of government agents* that violate the defendant's consti-

tutional rights. It does not purport to reach private actions of that character.